Newton Girl Scout Council, Inc. *vs.* Massachusetts Turnpike Authority.

Middlesex.    November 8, 1956. — December 12, 1956.

Present: Wilkins, C.J., Ronan, Counihan, Whittemore, & Cutter, JJ.

*Damages,* Eminent domain. *Value. Eminent Domain,* Damages. *Evidence,* Of value; Opinion: expert; Offer of proof; Hearsay. *Words,* "Market value."

In assessing damages of a girl scout corporation for a taking by eminent domain for an express highway of a wide strip through land of the corporation on which it conducted a residence camp for girls and which was located in a secluded wooded area in the country near an attractive pond, the corporation was entitled to just compensation for the diminution in value of its land by reason of the destruction of the camp's privacy. [192–193]

There must be a new trial of a petition for assessment of damages for a taking by eminent domain of a portion of property developed and used by its owner as a residence camp for girls and of a type not commonly bought and sold, where the trial judge consistently dealt with the case in a manner limiting consideration of market value of the property to value for conventional residential and other uses and precluding proof and consideration of its market value for use as a camp as one of the uses to which it was best adapted. [193, 199–200]

Statement of principles governing the assessment of damages for a taking of real estate by eminent domain as applicable in the instance of a taking of a portion of property developed and used by its owner as a residence camp for girls and of a type not commonly bought and sold. [193–197]

Newton Girl Scout Council, Inc. *v.* Massachusetts Turnpike Authority.

At the trial of a petition for the assessment of damages caused by the taking by eminent domain for an express highway of a strip of land across property used by its owner as a residence camp for girls in a locality in which camps of that type were not commonly bought and sold, testimony of the head of the real estate department of a national bureau of private schools with thirty years of experience in surveying property suitable for camp and school purposes all over the country should have been admitted as to the feasibility of continuing to operate the camp after the taking as bearing on the value of the petitioner's property for that purpose, even if the witness had "not engaged in the field of buying and selling real estate in Massachusetts." [197]

At the trial of a petition for assessment of damages for a taking of land by eminent domain, hearsay testimony from a real estate witness as to the price paid in a sale of nearby property in which the witness had not participated should not have been admitted. [199]

Where an expert witness for the petitioner in a proceeding for assessment of damages for a taking by eminent domain was in effect prevented by the trial judge's rulings from testifying at all on the issue of value, sustaining of the petitioner's exceptions to the exclusion of the witness's testimony was not precluded by the absence of an offer of proof. [199]

PETITION, filed in the Superior Court on August 12, 1955.

The case was tried before *Beaudreau*, J.

*Richard H. Lee*, (*James K. Fitzpatrick* with him,) for the petitioner.

*Albert W. Wunderly*, for the respondent.

CUTTER, J. This is a petition under G. L. (Ter. Ed.) c. 79, § 14, by Newton Girl Scout Council, Inc. (a charitable corporation hereinafter called the Girl Scouts), for the assessment of damages caused to it by the taking of a wide strip across its camp land in Natick and Weston by the Massachusetts Turnpike Authority (hereinafter called the Authority) for the construction of a toll express motor vehicle highway and an underpass for local access, in accordance with St. 1952, c. 354.[1] The Authority had awarded damages of $3.[2] The Girl Scouts introduced testimony in-

---

[1] This statute has been amended in respects not here relevant. See § 5 (k) for the Authority's powers with respect to land takings. See *Opinion of the Justices*, 330 Mass. 713, 721–725.

[2] An award of $2 was made also for the taking of a drainage easement not here of importance. The practice of making nominal awards of this type, in cases where it is plain that damages are serious, for purposes of negotiating advantage or otherwise, is an obvious disregard of the legislative purpose behind G. L. (Ter. Ed.) c. 79, § 6, to obtain an award of just compensation

dicating damages of $46,710. The case was tried to a jury who found damages of $9,500. In the course of the trial there was testimony that "the highest and best use of the property was for a camp purpose." The trial judge, however, (a) excluded substantial testimony offered by the Girl Scouts to show the extent and character of the damage to this use of the property caused by the taking; (b) admitted certain evidence of a witness called by the Authority about a sale of land in the neighborhood, not developed for camping purposes, in which sale the witness had not participated; and (c), as we read the record, failed to charge, as requested by the Girl Scouts, in respect of certain principles of law, which the Girl Scouts claimed were applicable to assessing damages for a taking of this property, peculiarly adapted to a special purpose and having its highest value for that purpose. The Girl Scouts duly excepted to these rulings on evidence and to the judge's failure to charge as requested.

The property in question, containing before the taking more than seventeen acres of land, was used as a residence camp, for girls. Owned in fee by the Girl Scouts, it was located on the boundary of Natick and Weston on the north shore of Nonesuch Pond. It had been maintained over a period of time in a secluded wooded area and was approached by a winding road through the forest. Prior to the taking, the property constituted an attractive, quiet country area, where some fifty-two girls with sixteen to twenty counselors and staff could engage in a program of swimming, boating, archery, arts and crafts, nature study, dramatics, and music on rural ground unusually accessible for a property of this type for the children in the Greater Boston area for whom it was designed. It was testified that there was no acreage

---

by fair initial administrative action. See Nichols, Eminent Domain (3d ed.) § 25.5 at page 97. See also *Worcester* v. *County Commissioners of Worcester*, 100 Mass. 103, 105–106. Compare *Wood* v. *Milton*, 197 Mass. 531, 534. Action of the type taken by the Authority tends to coerce persons whose property has been taken to resort to litigation and to incur unnecessary expense, even though it does not invalidate the taking. See *Broderick* v. *Department of Mental Diseases*, 263 Mass. 124, 128; *Shea* v. *Inspector of Buildings of Quincy*, 323 Mass. 552, 557.

like this near Boston in the area out toward Framingham. The buildings[1] of comparatively little value for ordinary residential purposes were of a character ideally adapted to and equipped for the charitable and educational uses for which they had been built, of giving wholesome rural recreational and educational opportunities to groups of young city dwellers.

Testimony was received that, after the building of an express highway through the property, separating the camp from the portion of the Girl Scouts' land which shielded the camp from the then existing highway, the property could not be used for a young girls' residence camp any more and that its value for that use would be "practically nil." The exhibits show that the taking separated the campsite from a large parcel of land, also owned by the Girl Scouts, to the north of the taking and placed a large, modern, double highway athwart some of the Girl Scouts' woodland, thus destroying the seclusion and rural remoteness of the campsite, bringing to it the noise of heavy traffic (see *Wright* v. *Commonwealth*, 286 Mass. 371, 372–373, where traffic noises were taken into account in assessing damages) as well as the risk of unwelcome and unpleasant human intrusion, a matter of natural concern to public spirited citizens operating a camp for young girls. The chief advantages of the property for its camping use could have been found to be the intangible but very real values inherent in its atmosphere of great privacy in a quiet New England countryside near an attractive pond. The evidence warranted a finding that the highway had utterly destroyed that privacy, and thereby the possibility of giving to the young campers any illusion that they were really camping under natural conditions. When loss of such values can be shown to result from a partial taking of land, the owners are entitled to just compensation

---

[1] There were some twenty-six camp and service buildings on the property, most of them equipped with running water and other conveniences. An appropriate sanitary system had been provided and the buildings were supplied with electricity by underground cables. There was an open play area. Extensive repairs and improvements had been made to the buildings, beach and other facilities in recent years.

for the diminution in the value of their land by reason of this loss. *Barnes* v. *Commonwealth,* 305 Mass. 339, 340 (depreciation of value of property by reason of loss of view).

The Girl Scouts, in presenting their case, sought to recover compensation for the essential destruction of their property for the purposes for which they had acquired, developed, and used it. There was evidence that camps of this type were not commonly bought and sold in the area. Consequently, the Girl Scouts were forced to prove damages by other means than evidence of comparable sales. The Authority was supported, in essence by all the trial judge's rulings, in maintaining the position that the measure of damages was market value, on a basis which gave inadequate attention to important elements of value. A substantial amount of evidence of the value of the property for the special uses for which the property was best adapted and had been used was excluded. The result was that the Girl Scouts were in major degree prevented from showing the real character and extent of the money loss which had been suffered.

The general rule is that the measure of damages is the fair market value of the property actually taken at the time of the taking. *Tigar* v. *Mystic River Bridge Authority,* 329 Mass. 514, 517. *Kinney* v. *Commonwealth,* 332 Mass. 568, 571–572. With this, in the case of a partial taking, is to be included the diminution in value of the remaining land caused by the taking. *Trustees of Boston University* v. *Commonwealth,* 286 Mass. 57, 62, 64–65. *Goodyear Park Co.* v. *Holyoke,* 298 Mass. 510, 511. *Valentino* v. *Commonwealth,* 329 Mass. 367, 368. G. L. (Ter. Ed.) c. 79, § 12, as amended by St. 1953, c. 634, § 1. In determining fair market value, the effort is to determine "the highest price which a hypothetical willing buyer would pay to a hypothetical willing seller in an assumed free and open market." *Epstein* v. *Boston Housing Authority,* 317 Mass. 297, 299–300. All the uses to which the property is reasonably adapted may be considered. *Tigar* v. *Mystic River Bridge Authority,* 329

Mass. 514, 517–518. Although its "value for any special purpose is not the test . . . it may be considered, with a view of ascertaining what the property is worth in the market for any use for which it would bring the most." *Conness* v. *Commonwealth*, 184 Mass. 541, 542–543. See *Smith* v. *Commonwealth*, 210 Mass. 259, 261; *Olson* v. *United States*, 292 U. S. 246, 255.

Under the authorities already cited, the Girl Scouts, in their attempt to show loss of market value, were plainly entitled to present evidence bearing on every use to which the property was adapted, including (but not limited to) the specialized use for which the property was being employed effectively at the time of the taking. It was open to the Girl Scouts (a) to prove the value of the property for use by a charitable or religious organization or for a school group, and the extent to which the taking had injured or prevented that use; (b) to show the extent of the market, if any, for properties adapted for such use; (c) to establish the general basis on which such properties change hands when they do change hands, the various elements of value which are given weight by organizations naturally interested in the acquisition of such properties, and the methods by which such properties are usually acquired; and (d) to present evidence of other similar relevant factors.

It is not to be expected that the properties adapted for such a specialized use will have a very active market or that their market value can be shown by sales of nearby comparable property. Once developed, such properties are rarely abandoned or sold. To assist the trier of the fact of value to reach a just result when such a property is taken by eminent domain, it frequently will be necessary to allow much greater flexibility in the presentation of evidence than would be necessary in the case of properties having more conventional uses. In such cases, for example, detailed knowledge by expert witnesses of local prices of land for ordinary residential or commercial use may be far less helpful than knowledge of conditions (relevant to this particular type of property) over a wide geographical area and of the demand

for and use of comparable specialized properties by a particular industry or class of users or customers. The property may be of a character where, within fairly wide limits, geographical location has less effect on its value than its adaptability for a particular use. The properties may be of a type, not frequently bought or sold, but usually acquired by their owners and developed from the ground up, so that the cost of land plus the reproduction cost (less depreciation where appropriate) of improvements may be more relevant than in the ordinary case.

The practical problems inherent in the valuation of such properties have been recognized in the Massachusetts decisions, as well as in the authorities generally. Special opportunities for proof of value have long been afforded in cases where it is felt that there is no market value, in the sense in which, in most communities, market value is at all times reflected by a steady volume of sales of ordinary commercial and residential properties. The occasion for this difference in type of proof (permitting the use of valuation data other than those factors ordinarily bearing on market price) has been expressed in terms of absence of market value (see comprehensive discussion in *Tigar* v. *Mystic River Bridge Authority*, 329 Mass. 514, 517) or of market (see, for example, *United States* v. *Miller*, 317 U. S. 369, 374). The courts in these cases, however, may be doing no more than recognizing that more complex and resourceful methods of ascertaining value must be used where the property is unusual or specialized in character and where ordinary methods will produce a miscarriage of justice. In such cases, it is proper to determine market value from the intrinsic value of the property and from its value for the special purposes for which it is adapted and used. See Nichols, Eminent Domain (3d ed.) § 12.32, especially at pages 134–136, and §§ 18.41 [3], 18.42; Jahr, Eminent Domain, §§ 71, 78, 82 (specialty uses), 83, 84 (properties of nonprofit organizations); Orgel, Valuation under Eminent Domain (2d ed.) §§ 30, 37–40, especially at pages 177–179, 181–183; Hanify, Damages in Eminent Domain, 34 B. U. L.

Rev. 146, 151–152; McCormick, Measure of Compensation in Eminent Domain, 17 Minn. L. Rev. 461, especially at pages 467–470.

These unusual problems of proof of damages most frequently arise in cases of service-type properties like churches, convents, hospitals, country clubs, school and college premises and buildings of religious and charitable societies and similar organizations. In Massachusetts, problems of this type have arisen in the following cases among others. *First Parish in Woburn* v. *County of Middlesex*, 7 Gray, 106 (church). *May* v. *Boston*, 158 Mass. 21, 29–31 (land adapted to park use). *Beale* v. *Boston*, 166 Mass. 53 (fee of street, as to the value of which the court at page 56 held evidence of the cost and nature of the petitioner's prior improvements to be relevant). *Cochrane* v. *Commonwealth*, 175 Mass. 299, 302 (mill site especially valuable for bleachery). *Conness* v. *Commonwealth*, 184 Mass. 541 (mill site). *Beals* v. *Brookline*, 245 Mass. 20 (improved private way taken for highway purposes). *Vineyard Grove Co.* v. *Oak Bluffs*, 265 Mass. 270, 275–279 (beach property with sea wall on it, used or adaptable for use for bath houses). *Tigar* v. *Mystic River Bridge Authority*, 329 Mass. 514, 517–519 (partly completed refrigerating storage plant). See *Muskeget Island Club* v. *Nantucket*, 185 Mass. 303, 305–306 (testimony of assessor admissible on value of sand island alleged to be useful principally for shooting); *Smith* v. *Commonwealth*, 210 Mass. 259, 261–262 (under the particular circumstances, the value of property for water supply purposes was held irrelevant); *Trustees of Boston University* v. *Commonwealth*, 286 Mass. 57, 62 (value of property for specialized university or hospital use as a single unit of land held properly to be considered where only part of land was taken). Compare *Sargent* v. *Merrimac*, 196 Mass. 171, 174–176 (trial judge upheld in excluding evidence of the special value of land if used for water supply purposes, when in fact the land was taken for such purposes); *Assessors of Quincy* v. *Boston Consolidated Gas Co.* 309 Mass. 60, 65 et seq. (reproduction value and other elements of value of a gas distribution plant were con-

sidered for tax purposes, since the "property was adapted to a single use and its value depended entirely upon a continuance of that use"). See to same general effect *Boston Gas Co.* v. *Assessors of Boston,* 334 Mass. 549, 566.

It is, of course, true that, where there is no market value, in the sense of a steady current of sales of similarly used properties in the vicinity, the burden is on the owner to show that it is impossible to prove the value of the property without using some mode of ascertaining value which does not depend on market value in this sense of the term. See *Tigar* v. *Mystic River Bridge Authority,* 329 Mass. 514, 518. In the present case, however, the Girl Scouts had amply shown that camps of this type were not commonly bought and sold.

The specific exceptions of the Girl Scouts to the exclusion of evidence must be considered in the light of the general principles already discussed. The Girl Scouts offered the testimony of the head of the real estate department of the National Bureau of Private Schools with thirty years of experience in surveying property suitable for camp and school purposes all over the country. The witness was denied the opportunity to give his opinion whether it remained "feasible to operate this camp as a resident camp," apparently primarily because he was "not engaged in the field of buying and selling real estate in Massachusetts." Similarly he was denied the opportunity to give his opinion whether a Girl Scout camp "can be effectively operated within 250 feet of a toll highway, if the land on which this . . . camp is situated is at a lower level than the toll highway" or whether, without the taking, the land would "be suitable for a private resident camp." These questions, to an obviously qualified expert in the general field of use of real estate for camps and schools, were decidedly pertinent to the issue of the special value of this property, and the damage to it, for an important use of the property. Within the principles of valuation already discussed, they should have been permitted. *Chandler* v. *Jamaica Pond Aqueduct Corp.* 125 Mass. 544, 551. *Vineyard Grove Co.* v. *Oak Bluffs,*

265 Mass. 270, 279. See *Cornell-Andrews Smelting Co.* v. *Boston & Providence Railroad*, 215 Mass. 381, 390, and the discussion of a somewhat analogous problem in *Muzi* v. *Commonwealth, ante,* 101, 104–106. Although the trial judge is given a considerable range of discretion with respect to such testimony, here the effect of his consistent exclusion of evidence bearing on the specialized value of the property was "to deny to the owner the power of proving the real value of that property," in a situation where evidence of the value for the specialized purposes "given by persons who have knowledge thereof derived from experience in that business, must be admitted from the necessity of the case." See *Cochrane* v. *Commonwealth,* 175 Mass. 299, 302–303, where, with respect to land adapted to a mill site, it was also said, "no one can testify to that value by knowledge derived from the sale of lands in the neighborhood; they are not similar lands; nor by sales of mill sites for such purposes, for mill sites are not commonly bought and sold."

The president of the Girl Scouts was not permitted to give her opinion of the value of the property. She had been active in the work of the camp from 1953 to 1956 as president and, for three years before that, as vice-president. She had been charged with overseeing the property, its repairs, and remodeling. She had participated in the purchase of new property, and had been actively investigating, with various real estate men, a new site for the camp enterprise. An owner of real estate (*Rubin* v. *Arlington,* 327 Mass. 382, 383–385) or an officer of a corporation (*Winthrop Products Corp.* v. *Elroth Co. Inc.* 331 Mass. 83, 85–86) must have knowledge of the real estate, apart from his ownership or mere holding of an office, which qualifies him to express an opinion as to its value. The determination whether such knowledge exists is a preliminary question of fact for the judge. The issue on which the Girl Scouts offered the evidence here in question was on the special value of the property for a use about which the witness had very close knowledge over a period of years. In view of the importance of this issue and the special problems of proof involved, the

testimony might well have been received. However, as there must be a new trial in any event, it is not necessary to decide whether the judge exceeded his discretion in excluding the testimony.

A real estate witness, called by the Authority, who, from the record, does not appear to have had special experience in determining the value of the type of camp property here involved, was permitted to testify to the limited value of the property for conventional residential purposes. No objection was made to the admission of this evidence, but exception was taken to his being allowed to give the price at which a nearby property (not shown to have been similarly used for camp purposes) had been sold in 1951, at least three years before the taking, because the witness had only hearsay knowledge of the price paid in a transaction in which he had not participated. Although an expert witness may give the reasons for his opinion, even if gained from hearsay (*Davenport* v. *Haskell*, 293 Mass. 454, 459), this should be done in such terms that inadmissible hearsay is not introduced in a manner prejudicial to a party. Without producing a party to the sale, who could be subjected to cross-examination, direct testimony about the terms of a particular transaction should not have been admitted over objection. See *Hunt* v. *Boston*, 152 Mass. 168, 171; *Commonwealth* v. *Sinclair*, 195 Mass. 100, 108. See also by analogy *Tigar* v. *Mystic River Bridge Authority*, 329 Mass. 514, 519–520.

The Authority contends that the exceptions to the exclusion of testimony as to value cannot be considered, because of failure of counsel for the Girl Scouts to make an offer of proof. In effect two witnesses called by the Girl Scouts were erroneously prevented from testifying at all on the issue of value. In such cases, an offer of proof is not required. *Muskeget Island Club* v. *Nantucket*, 185 Mass. 303, 306. *Old Silver Beach Corp.* v. *Falmouth*, 266 Mass. 224, 226–227.

With respect to the failure of the trial judge to charge as requested by the Girl Scouts, the record is somewhat confused. The Girl Scouts asked that an instruction be given that "Where property is of a kind that is not commonly

bought and sold in the vicinity, the measure of damages is not to be limited to market value, and the jury may consider its value for the special purpose for which it was used." This request was obviously based on *Tigar* v. *Mystic River Bridge Authority,* 329 Mass. 514, 517–518. The judge gave this instruction with a minor modification and then, after a colloquy with counsel, appeared to revoke it. Some confusion also may well have arisen as to the precise sense in which the term "market value" was being used by judge and counsel. We have not been given in the bill of exceptions a sufficient summary of the judge's charge to be sure in what sense the term had been defined by him. As the matter was left, the jury might well have been misled into believing that only market value for purposes of sale for residential or other conventional uses was to be considered. The judge should have made it plain that, in a case like this of a property primarily adapted for a specialized use and of a type not frequently bought or sold as such, the damages caused by the taking were not to be measured solely by the effect of the taking on the value of the property for ordinary real estate development; and that the value of the property for every reasonable present and potential use of the property was to be carefully considered, including the use of the property for the special purpose for which it had been constructed and was being employed by the Girl Scouts.

*Exceptions sustained.*