MARCO S. MARINELLO ASSOCIATES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent. MARCO S. MARINELLO and MARY S. MARINELLO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Marco S. Marinello Associates, Inc. v. Commissioner
Docket Nos. 5612-70, 5639-70
United States Tax Court
T.C. Memo 1975-78; 1975 Tax Ct. Memo LEXIS 297; 34 T.C.M. (CCH) 392; T.C.M. (RIA) 750078; March 25, 1975, Filed Cornelius J. Moriarty, Jr., for petitioners. Willard J. Frank, for respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined deficiencies in Federal income taxes of petitioners as follows: [1] Dkt. No.
Taxable year
Ended Deficiency
5612-70
Marco S. Marinello Associates, Inc.
5/31/65
$57,441.01
5/31/66
21,419.56
5/31/67
397.87
5639-70 Marco S. Marinello and Mary S. Marinello
12/31/65
21,362.45
12/31/6
1,825.16
The issues remaining to be decided are: 1. Whether the corporation realized gain in 1965 as a result of an involuntary conversion. 2. Whether section *298 1033[2] permits the deferral or nonrecognition of any gain realized in 1965 or 1966 on such conversion. 3. Whether any portion of a condemnation award was paid for severance damages. 4. Whether certain payments made by the corporation to its sole shareholder constituted repayment of debts and interest thereon, or constructive dividends. FINDINGS OF FACT Some of the facts are stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Marco S. and Mary S. Marinello [3] resided in Holyoke, Massachusetts, at the time their petition was filed. Their Federal income tax returns for 1965 and 1966 were filed on the cash basis with the district director of internal revenue, Boston, Massachusetts. Marco S. Marinello Associates, Inc., [4] had its principal place of business at the time its petition herein was filed in Holyoke, Massachusetts. Its accrual basis Federal income tax returns for the taxable years in question were filed with the district director of internal revenue, Boston, Massachusetts. *299 At all material times, Marinello was president of Associates, and its sole shareholder. Since its incorporation on January 24, 1956, Associates has been engaged in the operation of a golf course and related activities in Holyoke, Massachusetts, first as lessee and subsequently as owner. Prior to May 5, 1964, the golf course consisted of 18 playing holes and a clubhouse located on approximately 115 acres of land. Involuntary conversion
On May 5, 1964, the Commonwealth of Massachusetts took a portion of the golf course by eminent domain, for the purpose of constructing an interstate highway. The property taken consisted of a strip of land approximately 300 feet wide, totaling approximately 21 acres. The taking destroyed six of the 18 holes of the golf course, and the line of taking passed through and hence destroyed its clubhouse. The taking also cut off the course's only access to a street. On or about January 21, 1965, the Commonwealth *300 offered Associates $281,000 as compensation for the damages caused by the taking. The legal effect of such an offer, whether accepted or not, was to foreclose the recovery of interest in a subsequent damage action on any award not in excess of the Commonwealth's offer. Associates elected to accept the offer as payment protanto, meaning it retained the right to seek additional damages but could also be required to return part of the award, with interest, if $281,000 exceeded the damages ultimately determined by a court. The $281,000 settlement was based upon a report by a reviewing appraiser who characterized it as a reasonable measure of "fair market value and/or damages." Associates received the $281,000 protanto payment on or about February 15, 1965. Of this amount, $92,824.92 was paid directly to the Holyoke National Bank in satisfaction of a first mortgage on the corporation's real estate. Some of the protanto award was used to repay the amounts carried on the corporate books as accounts and notes payable to Marinello. Associates also invested part of the proceeds in savings certificates. On or about January 11, 1965, Associates filed a petition *301 for assessment of damages in state court. A jury trial followed. The jury found total damages resulting from the taking in the amount of $368,000, against which the protanto payment was applied, leaving a balance of $87,000 plus accumulated interest. Payment of this amount took place on April 5, 1966. The jury award did not allocate any specific sum to severance damages. Associates' adjusted basis in the condemned property was $65,315.20. The adjusted basis of the remaining property of Associates was in excess of $35,000. As of May 31, 1966, the corporation had reinvested $40,341.18 of the award in eligible replacement property. All of the remaining proceeds were similarly reinvested by May 31, 1967. During June and July, 1967, Associates borrowed $145,000.00 from Holyoke National Bank. On March 14, 1968, it was granted a mortgage loan by the Small Business Administration in the amount of $250,000.00, of which $144,019.20 was paid directly to Holyoke National Bank in payment of its loan. The proceeds of these loans were used to finance the replacement of the condemned property. Associates was advised by its accountant, and believed, that it would be entitled to defer *302 recognition of its gain under section 1033 if all the proceeds of the taking were reinvested in replacement property within one year after the close of the taxable year in which it received the final judicial award; that is, by May 31, 1967. The accountant was neither an attorney nor a certified public accountant, and had never held a Treasury card. He based his judgment of the time within which reinvestment was required solely on discussions with an employee of the Massachusetts Department of Public Works and consultation of a commercially published tax service. Although the accountant was aware of Associates' court petition seeking additional damages, he never obtained an estimate of how long the trial was expected to last. On or about October 14, 1968, an audit of Associates' Federal income tax returns by the Internal Revenue Service was completed. On or about the following January 14, Associates filed an application for extension of the time permitted for replacement of the converted property. The application was denied by the district director, as was the corporation's request for reconsideration. Loan Repayments and Interest vs. Dividends
The organization of Associates *303 followed negotiations between Marinello and the Wyckoff Park Realty Corporation (Wyckoff), at that time the owner of the golf course. On February 9, 1956, Associates and Wyckoff entered into an agreement whereby Associates leased the property at an annual rental of $3,000 for a term of 20 years. Associates was obligated to construct a new clubhouse for the golf course with a value of at least $25,000. It also received an option to buy the property for $60,000. On April 24, 1962, Associates exercised its option to purchase the property. At the time it was acquired, the golf course was in a run-down condition and was not operating at a profit. Marinello intended to turn it into a money-making enterprise. From its inception, Associates' cash requirements were met with funds received from Marinello. Associates carried on its books an account labelled "Accounts Payable -- Marco" representing sums advanced by Marinello at various times from the date of incorporation through May 31, 1960. During the fiscal years ending May 31, 1965 and May 31, 1966, payments totaling $6,629.19 and $7,300.00, respectively, were made by Associates on this account. [5]
*304 The corporate books also contain an account labelled "M.S. Marinello - Notes Pay." The sums credited to this account, according to the corresponding journal entries, were as follows: Date
Explanation
Amount
(undated)
to record bonus to Marco for the year
$ 3,600.00
9/30/60
to show Marco's Note in its own acct.
7,555.00
5/17/62
to record salary for Marco S. Marinello for the year of $ 17,000.00 withholding $ 3,400.00 for taxes and $ 150.00 for social security
13,450.00
5/15/63
to record note given to Marco S. Marinello for salary for the year withheld Fed. tax $ 2,800.00; state tax $ 430.50; Soc. Sec. $ 174.00. Actual salary gross $ 14,000.00
10,595.50
5/6/64
to record note given to M. Marinello for salary for year [6]
12,916.00 Payments aggregating $3,861.06 were made on this account prior to May 31, 1962. The balance in the account on June 1, 1964, was $44,255.44, which sum was paid to Marinello on February 25, 1965. On its income tax returns, Associates deducted *305 the following amounts as compensation paid to Marinello: Taxable year ending May 31
Amount
1957-1959
None
1960
$ 3,600
1961
3,600
1962
17,000
1963
14,000 [7]
1964
17,000
1965
None
1966
12,000
1967
None Marinello reported these amounts as income in the indicated years. He received 30-day six percent demand notes of the corporation, which were recorded in its notes payable account. No interest was paid or accrued on any of these notes until May, 1964. At that time, Associates paid Marinello $1,880.37. A further payment of $5,104.83 was made on May 31, 1965. Marinello did not demand payment of interest or principal on these notes before such time as they were actually paid. Principal was paid in full in 1965. The corporation's financial state was often such that it would have been unable to pay the notes in 30 days according to their terms. The corporation never declared a dividend during the period under consideration. It had a deficit in accumulated earnings for every year prior to 1965, but had current earnings in 1959 and 1960. ULTIMATE FINDINGS OF FACT Of the *306 $281,000 paid to Associates by the Commonwealth of Massachusetts in 1965, $21,000 constituted severance damages to the retained property. Of the $44,255.44 paid by Associates to Marinello in 1965 and charged to the account labelled "Marco S. Marinello - Notes Pay." $36,700.44 constituted repayment of a bona fide indebtedness and the balance constituted a distribution of earnings and profits of Associates. The payments by Associates to Marinello of $6,629.19 in 1965 and $7,300.00 in 1966, both of which were charged to "Accounts Payable - Marco", were distributions of earnings and profits of Associates and not repayments of bona fide indebtedness. OPINION Involuntary conversion
We may dispose quickly of the first issue raised by the corporate petitioner. Associates urges us to hold that it realized no gain in 1965 from the condemnation of a portion of its golf course [8] because the amount received as a payment protanto would have to be repaid if, and to the extent that, a court found such payment to exceed the damages actually suffered. Aside from the fact that the record shows no real likelihood that such a repayment would be required, it is clear that Associates *307 treated the money as its own, paying over substantial amounts to its sole stockholder, and indeed instituted court proceedings to recover additional damages. The law is settled that when proceeds of a condemnation award are paid under a claim of right, and without restriction as to their use, gain is realized whenever the total receipts exceed the adjusted basis of the condemned property. Scolari v. Commissioner,497 F.2d 962 (C.A. 9, 1974), affirming per curiam T.C. Memo. 1973-166; TownPark Hotel Corp. v. Commissioner,446 F.2d 878 (C.A. 6, 1971), affirming per curiam T.C. Memo. 1970-261; CasalinaCorp.,60 T.C. 694 (1973), on appeal to C.A. 4, July 19, 1974; R.A. Stewart & Co.,57 T.C. 122 (1971); Conlorez Corp.,51 T.C. 467 (1968); Adolph K. Feinberg,45 T.C. 635 (1966), affd. 377 F.2d 21 (C.A. 8, 1967). See North American Oil Consolidated v. Burnet,286 U.S. 417 (1932). Associates' argument that the money *308 was "forced" upon it by the terms of the state statute -- which denied the accrual of interest -- misses the mark, for it does not rebut the fact that Associates obtained unrestricted use of the funds under a claim of right. This fact distinguishes the situation herein from that involved in Nitterhouse v. United States, 207 F.2d 618 (C.A. 3, 1953), upon which Associates relies, where the taxpayer did not exercise control over the condemnation proceeds during the year in issue and the issue was one of constructive receipt. Nor is it material that Associates would have had to pay interest on any amount of the pro tanto awardthat it would have been required to refund. Harry D. Aldridge,51 T.C. 475, 479 (1968). Associates next contends that, if gain was recognized by virtue of the 1965 payments, *309 it is entitled to defer recognition of that gain under section 1033. [9] Respondent denies the applicability of that section, on the ground that the proceeds of the taking were not reinvested within the time period required by section 1033(a)(3)(B). Associates concedes that the proceeds were not reinvested within the one-year period, but alleges that the district director abused his discretion by refusing to grant its request for an extension of time in which to complete the reinvestment. *310 Respondent has authority under the statute to prescribe regulations fixing the time and manner for making such applications for extension. Section 1033(a) (3)(B)(ii). Section 1.1033(a)-2 Income Tax Regs., requires the application to be made within the same time period otherwise prescribed for the replacement of converted property, or later if the applicant satisfies the district director that (1) lateness was due to reasonable cause and (2) the application was filed within a reasonable time after the expiration of the required period. In this case, gain from the involuntary conversion was first realized on February 15, 1965. Associates' taxable year ended on May 31. It, therefore, had until May 31, 1966, to reinvest the proceeds in compliance with the statute, or seek an extension of time under the regulations. Relying on the advice of its accountant to the effect that the deadline was May 31, 1967, Associates did neither, but went ahead with its plan to redevelop the golf course. It reinvested the entire proceeds in eligible property by May 31, 1967. Associates *311 took no further action until an Internal Revenue Service audit of its returns was completed in October, 1968; it filed its application in January 1969. Prior decisions leave little doubt that Associates failed to meet either prerequisite established by the regulations for the consideration of applications for extension. Associates' application was filed 31 months late, a delay greatly in excess of the 10 months found fatal in James E. Latimer,55 T.C. 515 (1970) and in "sharp contrast" with the six months found reasonable in Theron M. Lemly,T.C. Memo. 1973-147, heavily relied upon by Associates. And Casalina Corp.,supra, held that reliance on an accountant did not amount to reasonable cause for late filing where -- as here -- the accountant lacked tax expertise sufficient to justify such reliance. Compare Theron M. Lemly,supra, and Rev. Rul. 72-27, 1972-1 C.B. 226. Even though Associates may have acted in good faith throughout the time period here involved in seeking to fulfill the conditions of section 1033, respondent is entitled to insist that parties seeking to qualify for statutory benefits pursue *312 their rights with reasonable diligence. While we might well have acted differently had we occupied the district director's shoes, given the decided cases in this area, we cannot conclude that his rejection of Associates' application did not have a "rational basis," Kolstad v. United States,276 F. Supp. 757, 761 (D. Mont. 1967), and was "Plainly arbitrary," Casalina Corp.,supra, 60 T.C. at 701. See also Boyce v. United States,405 F.2d 526, 532 (Ct. Cls. 1968). We hold that the gain realized on the involuntary conversion by Associates must be recognized.[10]
Because we have ruled adversely to Associates under section 1033, we must now consider its alternative argument that a portion of the condemnation proceeds were attributable to "severance" damages, i.e., damages representing a decrease *313 in the value of the remaining parcel rather than the value of the land involuntarily converted. Such damages are not treated as an "amount realized" from the sale of the condemned property (at least not in computing the gain from the sale or exchange of such property, cf. Conran v. United States,322 F. Supp. 1055 (E.D. Mo. 1971)), but are applied in reduction of the basis of whatever remains.[11]Vaira v. Commissioner,444 F.2d 770 (C.A. 3, 1971), modifying 52 T.C. 986 (1969); Arch B. Johnston,42 T.C. 880 (1964); L. A. Beeghly,36 T.C. 154 (1961). The portion of the total award representing severance damages is a fact that is to be determined from all of the circumstances surrounding payment. L. A. Beeghly,supra; see Graphic Press, Inc.,60 T.C. 674 (1973). [12]
*314 In Massachusetts, severance damages are assessed for the diminution in value, by reason of the taking, of the portion of property remaining to the landowner. Aselbekian v. Massachusetts Turnpike Authority,341 Mass. 398, 169 N.E. 2d 863 (1960). Such diminution may include cost of adapting the remaining land to a reasonable use, Valentino v. Commonwealth,329 Mass. 367, 108 N.E. 2d 556 (1952), and may reflect interference with an unique use to which the entire property was formerly suited. Newton Girl Scout Council, Inc. v. Massachusetts Turnpike Authority,335 Mass. 189, 138 N.E. 2d 769 (1956). We recognize that petitioner has the burden of proof and that the record herein is far from clear as to what amount was paid as severance damages. We are also mindful that a taxpayer cannot make "an after-the-event unilateral allocation of damages" (see Arch B. Johnston,supra,42 T.C. at 884) and that it is the actual apportionment *315 of severance damages contemplated by the parties which is the determining factor. See L. A. Beeghly,supra.
The damage appraisal on which the Commonwealth based its offer of $281,000 included the following items: 9 holes lost, improvement value at $10,000
$90,000
Cost to realign remaining holes * * *
7,000
While the reviewing appraiser's comments recite that severance damages to a portion of the tract were more than offset by the enhancement of another portion, in light of the above summary, we cannot agree that he intended this to mean there was a net enhancement overall. The testimony and exhibits show, for example, that at most seven holes could have been considered physically damaged by the taking; yet the appraiser considered nine holes as "lost." Two additional holes must have been deemed lost because of the anticipated realignment of the remaining property to a nine-hole course. Similarly, damages included the projected cost of such realignment, an expenditure relating solely to the land retained. Therefore, the Commonwealth's own experts actually estimated the following amount as "severance" damages: Loss of 2 holes at $10,000
$20,000
Cost to realign remaining holes
7,000
$27,000
Less net enhancement of other parcels
6,000
Severance damages
$21,000
*316 In view of the foregoing, we conclude that $21,000 of the $281,000 paid to Associates in 1965 should be considered as allocated to severance damages. Petitioner has not carried its burden of showing that the remaining $260,000 of the protanto payment was intended as anything but compensation for the direct taking. Therefore, that amount must be considered as realized on the disposition of the condemned property. With regard to the additional $87,000 in damages paid following the jury trial, there is nothing in the record to demonstrate with particularity any categorization of the award. Consequently, no part of that amount can be considered severance damages. Loan Repayments and Interest vs. Dividends
The final question before us is the proper characterization of certain amounts denominated on Associates' books as accounts payable and notes payable to Marinello. Marinello excluded payments received with respect to those accounts from his income as repayment of loans. Respondent determined those payments were taxable dividends. Respondent also disallowed a deduction claimed by Associates for interest on the alleged notes. Our resolution of this conflict has not *317 been aided by the need to rely on an incomplete and often inconsistent record. The parties not only have asserted differing legal conclusions but, in some respects, have assumed conflicting factual premises. Some clarity may be achieved if the two corporate accounts are considered separately. The account labelled "Marco S. Marinello -- Notes Pay." was used to record 30-day, six percent demand notes of the corporation given to Marinello from time to time. Associates paid marinello $44,255.44, allegedly in satisfaction of all such notes then outstanding in 1965. Of the items credited to this account, all but $7,555 appear to represent unpaid salary aggregating $40,561.50. While the issue is not entirely free from doubt and while we recognize that amounts, representing unpaid salary and initially entitled to the status of debt, may like other types of indebtedness lose that status after the passage of time and appropriately be treated as a capital contribution, we are satisfied that, under the particular circumstances of this case, such result should not obtain. Upon the basis of the record as a whole, we conclude that to the extent that such amounts represented unpaid salary due *318 Marinello, which respondent has not challenged as a deduction by Associates on the grounds of unreasonableness or otherwise, they should be treated as bona fide indebtededness by Associates to Marinello during the taxable years in question. In this connection, the corporation paid $3,861.06 in reduction of its notes prior to May 31, 1962. Since petitioners have not attempted to attribute this payment to any particular note, we believe it should be applied against the salary notes so as to reduce the amount of the nontaxable repayment of salary obligations in 1965 to $36,700.44. The $7,555 entered in the notes payable account in September 1960 did not represent a salary obligation. The best explanation for its presence ascertainable from the record is that it was given in exchange for cash advanced to the corporation. [13] It is, therefore, necessary to decide whether that amount constituted a contribution to capital or a bona fide loan. *319 An endless line of cases have considered the vexing issue of when a corporation's debt instrument should be treated as additional shareholder equity.[14] Suffice it to say that decision generally turns on the isolation and classification of particular features of the transaction subjudice thought to be characteristic of debt or of equity. [15]Litton Business Systems, Inc.,61 T.C. 367 (1973). Respondent relies on Brake & Electric Sales Corp. v. United States,287 F.2d 426 (C.A. 1, 1961), which found the following to be "relevant considerations" to a finding that corporate notes were not valid debt in the hands of a sole shareholder (287 F.2d 428, footnote omitted): (1) that the assets transferred to the corporation as part of the transaction were assets essential to the conduct of the business; (2) that Brown [the shareholder] was at all times in control of the situation respecting the business and the decision of enforcing the notes; (3) the notes were regularly extended when they fell due; (4) Brown's testimony that he would *320 never have demanded payment if the corporation would be required by such demand to raise the cash by borrowing from another source; (5) that under the realities of the situation in 1950 Brown could not realistically have expected that in five years the plaintiff would be able to pay $90,000 in cash at least without putting itself into a disadvantageous financial position, a circumstance which Brown as sole stockholder would certainly want to avoid; (6) at no time since the formation of plaintiff has it paid a dividend, nor have the directors even discussed the possibility of declaring a dividend, even though the business has been expanding profitably during the entire period and in each year had a substantial earned surplus. Because this case arises in the First Circuit, it is appropriate for us to apply these standards (which we note also conform to the standards generally applied) in the instant case. Litton Business Systems, Inc.,supra,61 T.C. at 376. We agree that, with respect to the $7,555 item, similar factors are present here: (1) from the outset, Associates needed cash for operation and improvement of the property [16] so that cash advances made by its sole shareholder *321 provided essential working capital; (2) Marinello was clearly the controlling force in the corporation; (3) and (4) there was never an attempt to collect the debt or interest thereon when due; and (5) any such attempt would have been futile because of the company's financial state; [17] (6) Associates never paid a dividend. In addition, Marinello's claim was effectively subordinated to those of the corporation's trade creditors; in fact the record shows that it did not consider that there was any distinction between himself as sole shareholder and the corporation, believing that he "was the corporation." On the basis of all the evidence, we conclude that $7,555 of the amount paid to Marinello by Associates in 1965 constituted a taxable dividend and not the repayment of a bona fide indebtedness.[18]
*322 The other account is the corporation's recorded open account indebtedness to Marinello entitled "Accounts Payable - Marco." The parties have stipulated that payments of $6,629.19 in 1965 and $7,300.00 in 1966 were made with respect to this account. The only evidence bearing on the nature of these payments, other than the testimony of Marinello and the accountant, consists of a page from the corporation's books. The payments were applied against an outstanding balance existing since May 31, 1960, and on which no payments were made from May 31, 1962 to June 30, 1964. It is stipulated that the original balance reflected an actual cash advance by Marinello to Associates. The same factors mentioned above relating to the $7,555 in notes payable convince us that the "accounts payable" did not represent a bona fide debt of the corporation. Instead, we conclude that this was money meant to be withdrawn, if at all, when the company's financial condition permitted it. Its "repayment" constituted a taxable dividend to Marinello. [19]
*323 Decisions will be entered under Rule 155.
Footnotes
1. These cases have been consolidated for trial, briefing, and opinion.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
3. Mary S. Marinello is a party only because she filed a joint return with her husband Marco S. Marinello and he will be referred to hereinafter as Marinello or petitioner. ↩
4. Hereinafter referred to as Associates or the corporation.↩
5. These figures are accepted in accordance with the stipulation although they are difficult to reconcile fully with the fragmentary records the parties have introduced.↩
6. This journal credit was accompanied by these entries: ↩
Wages
$17,000.00
IWHT
$3,400.00
STWT
510.00
S.S.
174.00
7. Listed on "Compensation of officers" only; Schedule E not completed.↩
8. Respondent computed the corporation's gain as follows: February 15, 1965
Award
$281,000.00
Adjusted basis in property taken
- 65,315.20
$215,684.80
Legal and appraisal expenses
- 8,400.00
Gain
$207,284.80 April 5, 1966
Additional Award
$ 87,000.00
Legal expense
- 10,000.00↩
Gain
$ 77,000.00
9. SEC. 1033. INVOLUNTARY CONVERSIONS. (a) General Rule.--If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted-- * * * * * (3) Conversion into money where disposition occurred after 1950.--Into money or into property not similar or related in service or use to the converted property, and the disposition of the converted property (as defined in paragraph (2)) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph: (A) Nonrecognition of gain.--If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, * * * at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock. Such election shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe. * * * (B) Period within which property must be replaced.--The period referred to in subparagraph (A) shall be the period beginning with the date of the disposition of the converted property, or the earliest date of the threat or imminence of requisition or condemnation of the converted property, whichever is the earlier, and ending-- (i) one year after the close of the first taxable year in which any part of the gain upon the conversion is realized, or (ii) subject to such terms and conditions as may be specified by the Secretary or his delegate, at the close of such later date as the Secretary or his delegate may designate on application by the taxpayer. Such application shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe. By the Tax Reform Act of 1969, the period in subsection (a)(3)(B)(i) was lengthened to two years.↩
10. Under the wording of section 1033, petitioner is not entitled to postpone recognition of the portion of the gain represented by the final payment in April, 1966 even though it was reinvested prior to the end of Associates' next taxable year, i.e. the year ended May 31, 1967. R. A. Stewart & Co.,57 T.C. 122↩ (1971).
11. Amounts in excess of basis are treated as realized gain. ↩
12. See also Estate of Chesley M. Walter,T.C. Memo. 1971-244↩.
13. It is perhaps more than coincidental that the record contains five corporate notes payable to Marinello and dated March 29, 1957, one for $6,740 and four for $815 each; $7,555 is the sum of $6,740 and $815. The corporation's tax return for its taxable year ending May 31, 1957, shows no compensation paid Marinello in that year. Under the circumstances, we find unconvincing the scanty evidence offered by petitioners which purported to show that the $7,555 was derived directly from a bank loan (claimed to have been erroneously credited to Marinello's account instead of Associates') rather than from Marinello.↩
14. See Plumb, The Federal Income Tax Significance of Corporate Debt: A Critical Analysis and a Proposal, 26 Tax L.Rev. 369↩-640 (1971). 15. Plumb, supra,↩ note 14, at pp. 411-412, lists 32 types of such "evidentiary factors." 16. There is some testimony that the original lease had a substantial value at the time it was negotiated. Even if we were to accept the testimony at face value (which we do not and are not required to do), we see no basis upon this record for concluding that such value should be considered as a contribution by Marinello to the capital of Associates. The corporation was in existence prior to the execution of the lease, and it was the lessee from the outset. Under these circumstances, we think it clear that Marinello in carrying on the lease negotiations was at all times acting on behalf of Associates and that at no[*] time did he himself acquire any interest in the property. ↩
17. Associates rarely showed a net profit over the years prior to the condemnation, unless Marinello's salary is disregarded. Its tax return for the fiscal year ending May 31, 1964, shows a deficit in earned surplus of $946.52 and loans from stockholders in the amount of $44,255.44. ↩
18. The disposition of the interest deduction by Associates will track our determination that $36,700.44 of the $44,255.44 should be, and the remaining $7,555 should not be, considered bona fide indebtedness. The appropriate adjustment can be made in the Rule 155↩ computation.
19. The gain from the condemnation award found to be taxable herein to Associates is more than sufficient to create earnings and profits in excess of the amounts found to be dividends to Marinello in 1965 and 1966. Moreover, Associates' tax returns show current earnings and profits of $12,811.54 for the fiscal year ended May 31, 1965, and accumulated earnings and profits of $9,556.41 at the close of the fiscal year ended May 31, 1966. In any event, petitioners (who had the burden of proof) presented no evidence as to the actual amount of Associates' current or accumulated earnings and profits for those fiscal years.↩