MEDFORD HOUSING AUTHORITY *vs.* MARINUCCI
BROS. & CO. INC.
(and a companion case [1]).

Middlesex. Suffolk.    October 10, 1968. — November 15, 1968.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, SPIEGEL,
& REARDON, JJ.

*Negligence*, Of contractor, In dredging. *Act of God. Damages*, For injury of building.

A finding of negligence on the part of the defendant in an action with respect to the release into the air of hydrogen sulphide gas from the bed of a river during the course of the defendant's hydraulic dredging of "peaty material" therefrom under a contract with the Commonwealth, which gas came in contact with lead based white paint on the plaintiff's house, located near the area into which the material was

---

[1] Louis Sacco against the same defendant.

piped and deposited, and blackened the paint, was warranted by the evidence, including evidence that the contract permitted an alternative method of removal of the material by scooping it into scows and dumping it at sea, that the defendant knew or should have known of the properties of the gas and the risks in the release thereof, that the defendant operated the hydraulic dredge when atmospheric conditions greatly enhanced the risk of damage, and that the defendant knew of the release of the gas, even though such knowledge first came after the first of several blackenings of the paint on the plaintiff's house [700, 702]; the evidence did not warrant a finding that the damage was the inevitable result of the performance of the contract or a finding that it was due to an act of God. [702–703]

Subsidiary findings by an auditor in an action as to the exact cost of an entire repainting of and incidental work on a wooden house of the plaintiff which had not been painted for two years before the white paint, but not the nonwhite paint, on it was blackened by the negligent release of hydrogen sulphide gas by the defendant did not warrant a conclusion by the auditor that the diminution in market value of the property by the blackening was equal to such cost, and that conclusion should have been struck from the auditor's report. [703–704]

Two ACTIONS OF TORT. Writ in the Superior Court dated January 3, 1962, and writ in the Municipal Court of the Roxbury District dated February 19, 1962.

Upon removal of the action in the Municipal Court to the Superior Court the actions were tried together before *Coddaire,* J.

*Peter D. Cole* for the defendant.

*Lawrence J. Fitzgerald,* for Medford Housing Authority, submitted a brief.

No argument or brief for Louis Sacco.

WHITTEMORE, J. The plaintiffs in separate actions of tort had verdicts against the defendant for damage to the paint on structures separately owned by them caused by hydrogen sulphide gas released into the air in the course of dredging operations in the Mystic River carried on by the defendant in 1961 under contract with the Commonwealth.

The cases were tried together. The plaintiffs rested their cases on the reports of an auditor.

1. Findings that the defendant was negligent were warranted on the evidence and it was not error to deny motions for directed verdicts. The contract required the removal of large amounts of "unsuitable peaty material" and, if the

method of hydraulic dredging was used, the deposit of the material behind dikes in areas designated for the defendant's use near the plaintiffs' buildings. The contract permitted the use of the much more expensive alternative of lifting the material by scoop into scows and emptying the scows into the sea. By the hydraulic method the material is loosened in place by a rotary cutter and sucked and pumped through a long flexible pipe to the disposal area.

Hydrogen sulphide ($H_2S$) is generally found in pockets in marshy, peaty land and in river beds. In 1961 there were pockets of $H_2S$ in the marshy area and the bed of the Mystic River. A vice-president of the defendant, Guido J. Verrochi, who had to do with the performance of the contract, had a B.S. degree in sanitary engineering and had studied chemistry. At the time of the dredging he was familiar with $H_2S$, and knew it was found in peaty areas. The smell of $H_2S$ is that of rotten eggs; the gas is heavier than air and its spreading depends upon wind direction and humidity. If it comes in contact with lead based white paint it causes the paint to blacken by changing white lead oxide to lead sulphide.

On several occasions after the dredging began in 1961, when the weather was rainy, foggy or humid, the air near the plaintiffs' buildings smelled of rotten eggs, and discoloration appeared on the white paint of the buildings. The plaintiff Sacco first noticed this on his house in April, 1961. He spoke about it to Frank Gitto, the defendant's job superintendent, who thereupon inspected the house. There were similar discolorations of Sacco's house in May, 1961, July, 1961, and January, 1962. After each occurrence the discoloration gradually faded, but never completely.

In his report in the housing project case, the auditor found that on June 10, 1961, the director of the Department of Public Health of the city of Medford talked to Verrochi at the former's office about the odors emanating from the disposal area and that Verrochi assured the health director that he would do everything within reason to have the condition corrected. On July 13 and 14, 1961, the wind blew

from the disposal area toward the housing project buildings. The morning of July 14 was hazy and foggy. There were drippings on the sides of the housing project buildings. The executive director of the project, called to the site by the maintenance superintendent, inspected the buildings, smelled the strong, nauseating odor of rotten eggs and saw that all thirty-one of the buildings were blackened. On August 10, 1961, there was a similar occurrence with intensification of the discoloration. Certain surfaces such as the gutters, porch railings and bulkhead doors showed no discoloration. In the fall of 1961 the executive director of the project had some thoughts about painting the buildings but did not do it until three years later during which time the appearance of the buildings improved somewhat although the blackening had not entirely disappeared.

The auditor reasonably predicated his conclusion of negligence in each case on the notice to the defendant that $H_2S$ was escaping at the site, his findings that the defendant knew or should have known of the properties of $H_2S$ and the consequent risks, and the circumstance that there was a choice open to the defendant of not operating the dredge on days when the conditions were such as to greatly enhance the risk of damage. Even though in the Sacco case the first notice to the defendant of the presence of $H_2S$ came after the blackening of the house the jury could find that subsequent blackenings made the condition appreciably worse.

2. It was not error to decline to instruct that if the jury found that the alleged damage was the inevitable result of the performance of the contract the plaintiffs could not recover. We pass the issue of law. Nothing in the evidence warranted such a finding. Scoop and scow dredging would of course have released $H_2S$ but at different places and under different conditions. It does not appear that the contract made inevitable the continuous operation of the suction dredge whatever the atmospheric conditions. Nor could the judge have instructed that the defendant was not responsible if the damage was an act of God. It is frivolous to suggest that the accumulation of the gas in the peat and marsh and

its release in the course of road construction work was a vis major.

3. We turn to the issue of damages.

The auditor found as to the Sacco house that it had been painted in 1952 and 1959, when the gutters were oiled, the trim and downspouts painted green and the clapboards and shingles painted white. He also found that in order to repair the damage from the blackening the estimated cost of repainting was $1,050 which included cleaning and treating of gutters, cleaning and painting of porch floors and puttying of sashes and cracks where needed and that this was "fair and reasonable." He found and assessed damages in this amount. There was no other evidence of the monetary damage before the jury.

The auditor found as to the housing project buildings that they had been painted when built in 1950 and again in 1953, 1958, and 1964, except that the maintenance building, the most discolored, was repainted at some time between 1961 and 1964. The 1953 and 1958 paint jobs were good and workmanlike. In November, 1961, "to repaint . . . [the buildings] with one coat of paint . . . would have cost . . . $15,491." This repainting, we infer, would have been of all exterior surfaces. The one coat paint job in 1964 restored the buildings to a condition equal to that in which they were prior to the blackening. The auditor found damages in the amount of $15,491. Other evidence before the jury of the dollar measure of the damage was that a painting contractor in 1961 "gave an appraisal of $15,000 for a complete painting of all the buildings" and that the cost to the plaintiff of the 1964 work was about $15,000.

In each case the defendant moved to strike from the auditor's report both the subsidiary finding as to the 1961 costs of repainting and the ultimate findings of damages.

The measure of damages is the diminution in market value[2] and the cost of repairs is evidence on the issue.

[2] As to the effect of showing that the cost of repairs is less than the diminution in market value, see *Belkus* v. *Brockton*, 282 Mass. 285, 287–288; *Dalton* v. *Demos Bros. Gen. Contractors, Inc.* 334 Mass. 377, 378–379.

*Childs* v. *O'Leary,* 174 Mass. 111, 114–116. *Colangeli* v. *Construction Serv. Co.,* 353 Mass. 527, 530. From such evidence, with a view if taken, and from photographs, and by applying common sense, experience, and judgment, the jury can make an estimate of damages. *Colangeli* case, *supra.*

As these wooden structures had not been painted for several years prior to 1961, an entire repainting job would put them in substantially better condition than that existing before the blackening. The diminution in market value may have been substantially less than the cost of repainting the affected surfaces. Painting of nonwhite surfaces, with the usual reputtying of sashes and other such incidental work, was not made necessary by the defendant's wrong. On the subsidiary findings there was no reasonable basis for finding a difference in market value equal to the cost of the entire repainting jobs including work on surfaces not blackened. The subsidiary findings of the cost of repainting work if done in 1961 in each case properly stood as some evidence bearing on the issue of damages. The concluding finding in each case should, however, have been struck.

4. The exceptions are sustained. The new trials are to be as to damages only. The parties should adduce sufficient evidence to permit the damages to be ascertained under the rule with as much reasonable certainty as the circumstances permit.

*So ordered.*