BENEVOLENT & PROTECTIVE ORDER OF ELKS, LODGE NO.
65 vs. LAWRENCE REDEVELOPMENT AUTHORITY.

No. 91-P-336.

Essex. April 23, 1992. - December 14, 1992.

Present: BROWN, PORADA, & LAURENCE, JJ.

*Eminent Domain*, Damages, Reproduction cost. *Urban Renewal. Redevelopment of Land. Value. Damages*, Eminent domain. *Evidence*, Value.

In an action arising out of a taking by eminent domain of land for an urban renewal project, the judge acted within his discretion in admitting in evidence the depreciated reproduction cost of the land in question, where there was testimony and other evidence at trial from which the judge properly could conclude that the plaintiff's land was specially adapted for its charitable functions and, therefore, was used for a special purpose. [702-704].

In an action regarding the assessment of damages arising out of a taking by eminent domain of land for an urban renewal project, the judge properly allowed testimony as to the diminution in value of the remainder of the plaintiff's property not taken resulting from a land use restriction imposed upon the remainder by the defendant's urban renewal plan. [704-706].

CIVIL ACTION commenced in the Superior Court Department on January 30, 1989.

The case was tried before *David M. Roseman*, J.

*James D. Masterman* for the defendant.

*Philip M. Cronin* for the plaintiff.

BROWN, J. This appeal concerns the taking of land of the plaintiff (BPOE) by eminent domain pursuant to the Riverfront Urban Renewal plan by the Lawrence Redevelopment Authority (LRA),[1] and the effect, if any, for purposes of de-

---

[1]It had been contemplated that this parcel was to be the site on which Emerson College would be relocated. See *Benevolent & Protective Order of Elks, Lodge No. 65* v. *Planning Bd. of Lawrence*, 403 Mass. 531, 534-535 (1988).

termining damages, of a land use restriction imposed upon the remainder of the BPOE's property pursuant to that plan. After hearing evidence of the so-called "depreciated reproduction cost" of improvements on the BPOE's property, a jury determined the damages to be $2,500,000. Essentially, the appeal from an ensuing judgment in that amount (plus interest and costs) by the defendant LRA focuses on two grounds: (1) the propriety of the use of the disfavored depreciated reproduction cost approach to value (DRC)[2]; and (2) the effect of a restriction on use as an element of damages.

On February 5, 1988, the LRA, pursuant to an urban renewal plan under G. L. c. 121B, took by eminent domain a portion of the BPOE's property. The BPOE's property had been improved by the construction of a lodge building in 1969. Additional improvements — a pavilion, horseshoe pits, a softball field, a volleyball area, a parking area, and other outing grounds — were added later. The lodge and these ancillary facilities were used primarily for the BPOE's charitable functions.

1. *Depreciated reproduction cost.*[3] The LRA first attacks the admission of evidence of the disfavored DRC, as well as the propriety of its application by the BPOE's valuation experts.[4] Its argument appears to be based upon this court's opinion in *Correia* v. *New Bedford Redev. Authy.*, 5 Mass. App. Ct. 289, 291-292 (1977) (*Correia I*), which required the trial judge to make a preliminary finding that the plain-

---

[2]The three primary methods of calculating fair market value of real estate are depreciated reproduction cost (DRC), income capitalization, and market (comparable sales) data. See *Correia* v. *New Bedford Redev. Authy.*, 375 Mass. 360, 362 (1978), and authorities cited therein. These different valuation approaches will be alluded to in the opinion.

[3]We note that the LRA did properly preserve its objections to the use of the DRC evidence, at least in most of the instances where the plaintiff asserts otherwise.

[4]We are aware that "[t]here is danger . . . that evidence of reproduction cost (even if it purports to be fairly adjusted) may lead to 'an excessive award unless it is [in fact] *adequately* discounted for obsolescence and inadequacy as well as for physical depreciation.'" *Commonwealth* v. *Massachusetts Turnpike Authy.*, 352 Mass. 143, 148 (1967) (emphasis in original), citing Orgel, Valuation under Eminent Domain §§ 199, 188-198 (2d ed. 1953).

tiff established that a determination of fair market value using preferred methods of valuation (i.e., comparable sales, capitalization of income) would be impossible. On further appellate review, however, the Supreme Judicial Court, maintaining that it was not departing from long established principles, stated, "The rule of disfavor . . . should be viewed as one of need, not 'impossibility.' " *Correia* v. *New Bedford Redev. Authy.*, 375 Mass. 360, 366-367 (1978) (*Correia II*).

Placing great stress on the need for the preliminary finding referred to in *Correia I*, the LRA asserts that the trial judge failed to make the requisite companion preliminary findings to support the need to use DRC method evidence, i.e., that (a) the BPOE's property was special purpose property and (b) the other two valuation approaches were inadequate or unreliable due to the special, unique characteristics of the buildings and other structures. As to the types of properties presenting unusual problems of proof of damages warranting the admission of DRC evidence, see *Newton Girl Scout Council, Inc.* v. *Massachusetts Turnpike Authy.*, 335 Mass. 189, 196 (1956).

In eminent domain cases, the trial judge is "allowed to exercise sound discretion in determining when special conditions exist so as to justify the use of [DRC] data." *Correia II*, 375 Mass. at 367. Such discretion is quite broad. See *Library Servs., Inc.* v. *Malden Redev. Authy.*, 9 Mass. App. Ct. 877, 878 (1980), and cases cited. The BPOE correctly argues that it is the use of the property *taken as a whole* that determines whether the property is special purpose property, i.e., particularly well suited for the purpose for which it is used. The typical concerns over the use of DRC evidence, such as "where special purpose structures are very greatly out of date, are no longer well fitted to their particular use, and would not be reproduced [if destroyed or taken] by any prudent owner," do not appear to be present in this case.[5]

---

[5]In *Correia II*, the Supreme Judicial Court defined special purpose properties as "properties adapted for . . . a specialized use" which "may be of a type, not frequently bought or sold, but usually acquired by their

See *Commonwealth* v. *Massachusetts Turnpike Authy.*, 352 Mass. 143, 149 (1967). After considering conflicting testimony as to the availability of market data to compare to the BPOE's property, the judge, acting well within his discretion, determined that the BPOE had demonstrated the need to use DRC evidence. There was testimony and other evidence adduced at trial from which the judge properly could conclude that the BPOE's property, as improved by the pavilion, the ball fields, the parking area, and the lodge building itself, is specially adapted for its charitable functions, and, therefore, meets the definition of special purpose property expounded by the Supreme Judicial Court in *Correia II*. The admission of DRC evidence was not error, and the LRA's particular complaints about the witnesses' application of that evidence are not such as would cause us to reverse the judgment, as they merely bear on the weight the jury could have afforded such evidence. See and compare *Trustees of the Stigmatine Fathers, Inc.* v. *Secretary of Admin. & Fin.*, 369 Mass. 562, 569-570 (1976).[6]

2. *Effect of land use restriction.* At the time of the taking, the LRA recorded an urban renewal plan that authorized the taking in fee of 9.6 acres of the BPOE's fourteen-acre parcel and simultaneously imposed on the remaining 4.4 acres of land a restriction which limited its use to nonprofit benevolent purposes for a period of twenty-five years. At issue here is whether the imposition of a land use restriction on the remainder of the BPOE's land (requiring it to continue to be used for benevolent purposes only) diminished its value. The trial judge ruled that the restriction was essentially part of the taking, i.e., the taking and the restrictions "were one, an interrelated, simultaneous transaction," occasioned by the urban renewal plan, and he allowed testimony as to the effect of the restriction on value.

---

owners and developed from the ground up." 375 Mass. at 363, citing *Newton Girl Scout Council, Inc.*, 335 Mass. at 194-195.

[6]It is also significant in this case that the difference between the opinions of the experts for the BPOE and the LRA appears to have been primarily attributable to the value they gave to the unimproved land.

The LRA argues that the use restriction is analogous to "down zoning" and does not rise to the level of a taking. Citing our opinion in *Roach v. Newton Redev. Authy.*, 8 Mass. App. Ct. 618, 626 (1979) (*Roach I*), the LRA takes the position that, "[h]ad the restriction been an actual change in zoning which resulted from the urban renewal project, the zoning change would have to be disregarded in valuing property in a land damage proceeding." The LRA goes on to argue that the BPOE is "not entitled to compensation because the restriction was imposed, not as zoning, but as part of an urban renewal plan," and, citing *Lipinski v. Lynn Redev. Authy.*, 355 Mass. 550, 554 (1969), concludes that "[w]hether the redevelopment plan increases or decreases value is to be disregarded in assessing damages."

On further appellate review in *Roach v. Newton Redev. Authy.*, 381 Mass. 135 (1980) (*Roach II*), the court held that, although a potential use prohibited by a zoning restriction at the time of a taking may be considered as an element of value if there is a reasonable probability that the zoning law will be changed, "a probability of rezoning or an actual change in zoning cannot be taken into account if it 'results from the fact that the project which is the basis for the taking was impending.'" *Id.* at 137, quoting from 4 Nichols, Eminent Domain § 12.322[1] n.7.1 (rev. 3d ed. 1979). Based on its reading of *Roach II*, the LRA asserts that the effect of the taking upon the value of the remainder would be irrelevant because the use restriction was part of the urban renewal plan that occasioned the taking of the bulk of the BPOE's property, thereby barring compensation. This argument misses the mark.

In *Lipinski* and *Roach II*, the court addressed how the reasonable probability of certain changes might bear on the value of the subject properties at the time of the taking. In those cases, the issue raised respecting the land use restriction was the value of land that was taken; here, however, the alleged injury (diminution in value) the restriction caused is to the *remaining* 4.4 acres of the BPOE's land. "The measure of damages for the taking of land by eminent domain is

the market value, at the time of the taking, of the land actually taken and the decline, attributable to the taking, in the market value of the owner's remaining land." *Aselbekian* v. *Massachusetts Turnpike Authy.*, 341 Mass. 398, 400 (1960). See *Kane* v. *Hudson*, 7 Mass. App. Ct. 556, 559-560 (1979).

We agree with the BPOE that "the imposition of the restriction substantially affected the marketability of the remaining acres." Since compensation for all injury to the portion not taken is required (see G. L. c. 79, § 12), and the restriction here is such an injury, the effect of the restriction upon the value of the remainder is perforce relevant because the BPOE now is prohibited from realizing the value of the highest and best use of the remainder — here, industrial use. The jury thus were properly permitted to consider the diminution in value of the remainder resulting from the restriction.

*Judgment affirmed.*