## Massachusetts Port Authority *vs.* Sciaba Construction Corporation.

No. 99-P-784.

Suffolk. December 7, 2001. - April 16, 2002.

Present: Laurence, Mason, & Doerfer, JJ.

*Massachusetts Port Authority. Negligence,* Fire, Construction work. *Damages,* Repairs, Replacement or reconstruction. *Practice, Civil,* Instructions to jury.

Discussion of principles attending the determination of reasonable damages to be recovered for tortious injury to real property. [513-515]

In an action against a construction company for negligence arising from a fire started by its workers that caused substantial damage to a platform that was to be used in creating a waterfront park, the judge did not err in admitting evidence other than diminution of fair market value on the issue of damages, where the judge had discretion to determine that diminution of fair market value would not have been a fair and reasonable measure of the special value the property held as a place to build a park, and would not have fairly represented the actual injury suffered as a result of the fire. [515-516]

In an action against a construction company for negligence arising from a fire started by its workers that caused substantial damage to a platform owned by a port authority, which platform was to be used in creating a waterfront park, the judge reasonably allowed the jury to hear evidence of restoration and replacement costs and instructed them on the availability of those methods where, in light of circumstances presented by the unique position of the authority, as well as the distinct qualities of the property itself, the platform possessed a value to its owner that could not have been properly weighed by using the ordinary methods of damage calculations. [516-517]

At the trial of a negligence case, arising from a fire that was started by construction workers and that caused substantial damage to a platform that was to be used in creating a waterfront park, in which evidence of the platform's repair or replacement cost was relevant to damages, the amount awarded by the jury to the owner of the platform was clearly based upon evidence that reflected a reduction to account for the general obsolescence of the platform prior to the damage inflicted by the fire, and the jury was provided with appropriate instruction on the issue. [517-519]

At the trial of a negligence case, the judge did not err in submitting certain advisory questions to the jury on the issue of damages. [519]

Civil action commenced in the Superior Court Department on October 28, 1993.

The case was tried before *Paul A. Chernoff*, J.

*Michael R. Byrne* (*Robert P. Powers* with him) for the defendant.

*Richard d'A. Belin* (*Michael P. Sady* with him) for the plaintiff.

DOERFER, J. While workers from Sciaba Construction Corporation (Sciaba) were working on a platform owned by the Massachusetts Port Authority (authority), a fire broke out causing substantial damage to the platform. In this action for negligence[1] the authority obtained a judgment for damages in the amount of $681,934.50[2] against Sciaba. This appeal raises issues as to whether (1) evidence of replacement cost should have been considered by the jury and (2) whether the jury had adequate evidence and appropriate instructions on the issue of the obsolescence and depreciation of the platform at the time of the fire.

*Evidence at trial.* The legislation creating the authority charges it with, among other things, the improvement and operation of the East Boston waterfront property that is the subject of this appeal. See St. 1956, c. 465, §§ 1-6. In 1986, legislation was enacted directing the authority "to do any and all things necessary" to convert the property into public parks and a lobster terminal. See St. 1986, c. 349, § 4.

Pursuant to this legislative directive, the authority initiated the process of creating a waterfront park, now known as Piers Park, in East Boston for the recreational benefit of the public in general and the residents of East Boston in particular. The plan was to use an existing platform that was resting on wooden pilings as the base upon which to construct recreational improvements such as a walkway along the waterfront, an amphitheater, several pavilions, a playground, a wading pool, and significant landscaping. The platform needed approximately $280,000 in renovations to serve as a suitable support for such improvements. The authority hired Sciaba to perform the work.

---

[1] We need not recite the disposition of the contract claims brought by Sciaba or counterclaims of the authority relating to the same incident.

[2] The jury awarded the authority $1,049,130 on its negligence claim. That amount was reduced to reflect the jury's determination that the authority was thirty-five percent negligent.

While Sciaba was working with torches on the platform to remove some metal fittings during a heavy windstorm, hot metal fell onto the creosote-treated wood members comprising the platform and its underlying pilings and supports, igniting them and causing them severe damage. In this action the authority claimed that Sciaba was negligent in performing "hot work" on a windy day without proper permission and without adequate safety precautions.

On the question of damages caused by Sciaba's negligence, the authority put in evidence testimony tending to show that roughly sixty-one percent of the wooden members of the platform, other than the pilings, needed to be replaced after the fire. A consultant for the authority identified three options for completing the project. The first option was to completely remove the existing (and now fire damaged) structure, including the timber pilings and replace it with a new, entirely concrete, structure. The second option was to remove only the timber structure and replace it with concrete but to leave the wooden pilings on which it rested. The final option was to replace the timber members of the structure with new timber, while also leaving the existing pilings in place.

The consultant arrived at net cost estimates for each of these options after deducting the amounts that would be saved by not proceeding under the prefire schedule of work. For option 1, the cost estimate was $1,049,130, after deducting approximately $302,239, which represented the money earmarked by the authority for various aspects of the original contract, including replacing, testing, and treating the timber portions of the platform. Given that option 1 contemplated an entirely concrete structure, all costs relating to timber were avoided.[3] The net cost of option 2 was $1,104,264. Option 3 had an estimated net cost of $1,158,931. Since options 2 and 3 were closer to the original plan, in that each maintained at least a portion of the timber structure and encompassed many of the same construction tasks, the reductions were significantly less: $139,381 for option 2 and $38,925 for option 3.

---

[3]The authority's consultant estimated that the improvements necessary to convert the existing pier to a point where it could support the planned park would cost $280,000. The approximately $302,239 reduction in the postfire estimates reflected the original estimate as well as a pile load test credit.

Sciaba objected to the introduction of evidence of the cost of repairs or replacement on the ground that the only relevant evidence on the question of damages was the difference in fair market value caused by the fire. Neither the authority nor Sciaba introduced any evidence as to fair market value of the structure as measured by comparable sales or capitalization of earnings.

*Jury instructions.* The case was submitted to the jury as a series of questions. After instructing the jury that ordinarily the measure of damages is the diminution of market value resulting from a wrongful act, and explaining the "alternative formulation" of replacement cost, the judge instructed the jury:

> "[y]ou may consider the traditional way of assessing these kinds of damages, which means the diminution in value, the value of the pier before the injury and the value of the pier after the injury, and that differential being a measure of damages, of direct damages. Or, if you were to find that you can't reach that value, that it would be inappropriate or unfair to have that be the measure of damages, you could look for an alternative method.".

On the question, "[w]hat sum of money will fairly compensate [the authority] for injury caused by the negligence of Sciaba," the jury answered $1,049,130. This figure was identical to, and undoubtedly represented, the net cost of replacing the pier as estimated by the authority's consultant under option 1.

The judge also submitted two advisory special questions to the jury applicable to damages. One asked, "What was the change in the value of the pier as a result of the fire? (value before minus value after)." It was answered, "cannot be determined because value of pier prior to fire unknown." The other question asked, "What amount would have had to be expended to restore the pier to its pre-fire state," and it was answered, "cannot be determined."

The defendant moved for a judgment notwithstanding the verdict and for a new trial. In his memorandum of decision denying these motions the judge noted that

> "[t]he jury were instructed as to alternative theories of tort damages in regard to the damage to the pier. It appeared that an assessment of the difference in fair market value of

the pier pre-fire and post-fire was probably not ascertainable and, even if it were, it would not approach a just assessment of the real injury to the aggrieved party . . . . The jury scrutinized the evidence on the destruction of the pier, the options available to remediate the damage caused by Sciaba, and carefully assessed damages. The recognition by the jury that the traditional formula for tort damages would not meet the ends of justice allowed them to consider . . . alternative approaches . . . ."

*Recoverable damages for tortious injury to real property.* In general, a party who suffers injury that is proximately caused by the negligence of another is entitled to be fairly compensated by the tortfeasor for his or her loss; this principle underlies the rules for recovery of negligent damage to real property. See *Commonwealth* v. *Johnson Insulation*, 425 Mass. 650, 666 (1997). Because real property is often unique, no fixed formula for measuring damages has been derived from this principle. *Trinity Church in the City of Boston* v. *John Hancock Mut. Life Ins. Co.*, 399 Mass. 43, 48-49 (1987), citing *Wall* v. *Platt*, 169 Mass. 398, 405-406 (1897).

The body of case law that has developed in this area reflects that upholding the principle of fair and reasonable compensation requires flexibility in measuring the appropriate damages so as to account for the unusual or specialized character of real property and any special value it may hold for the particular owner. See *Newton Girl Scout Council, Inc.* v. *Massachusetts Turnpike Authy.*, 335 Mass. 189, 195-196 (1956); *Commonwealth* v. *Massachusetts Turnpike Authy.*, 352 Mass. 143, 147-148 (1967); *Trinity Church, supra* at 49. For this reason, in awarding damages the finder of fact should take into consideration all relevant evidence bearing on the nature of the property, the extent of the injury or loss, and the amount of money that will fairly compensate its owner for its injury or loss.[4]

Generally, the appropriate measure of damages in actions for

---

[4]In some circumstances the injured party will suffer consequential damages in addition to damages to the property itself. Consequential damages are recoverable in an action for negligent injury to property so long as they are necessary and reasonable expenses incurred as a proximate result of the tortfeasor's actions. Restatement (Second) of Torts § 927(2) (1979). In this

negligent injury to property is the difference between the fair market value of the property prior to the loss and its fair market value after the loss caused by the tortfeasor.[5] *Trinity Church, supra* at 48. One predicate for the application of this principle is the existence of a relevant market in which the property can be freely exchanged or sold. *Commonwealth* v. *Massachusetts Turnpike Authy.*, 352 Mass. at 147. Another predicate is that the diminution of fair market value be a fair and reasonable measure of the loss suffered by the owner. See *Newton Girl Scout Council, supra* at 195.

The trial judge has broad discretion to determine whether evidence other than fair market value is relevant to the question of damages. *Correia* v. *New Bedford Redev. Authy.*, 375 Mass. 360, 367 (1978). *Benevolent & Protective Order of Elks, Lodge No. 65* v. *Lawrence Redev. Authy.*, 33 Mass. App. Ct. 701, 703 (1992). In exercising this gatekeeping function the judge should take into consideration whether the property is "of a type, not frequently bought or sold, but usually acquired by [its owner] and developed from the ground up"; whether the property is "adapted for . . . a specialized use"; and whether the property is "of a character where, within fairly wide limits, geographical location has less effect on its value than its adaptability for a particular use." *Newton Girl Scout Council, supra* at 194-195. It is not necessary that the plaintiff show that it is impossible to introduce evidence of fair market value. *Correia* v. *New Bedford Redev. Authy.*, 375 Mass. at 365-367. Rather, the evidence must support the inference that diminution in fair market value is not a fair and adequate measure of damages. *Ibid.*

---

instance, the jury awarded the authority $58,022 in consequential damages.

There was ample evidence to support this aspect of the jury's award. This amount constituted the cost to the authority to have its consultant design a new concrete platform. We discern no impropriety in this award as there was evidence that these fees were a necessary and reasonable expense resulting from the damage caused by the fire.

[5]Where diminution in fair market value is the appropriate measurement of damages, fair market value may be established by a variety of methods. The following methods are often employed by real estate experts: "1. The current cost of reproducing a property less depreciation from deterioration and functional and economic obsolescence. 2. The value which the property's net earning power will support, based upon a capitalization of net income. 3. The value indicated by recent sales of comparable properties in the market." *Correia* v. *New Bedford Redev. Authy*, 375 Mass. 360, 362 (1978), quoting from

Certain types of property have been recognized as often requiring evidence of damages beyond the usual means: for example, if the property is used for a special purpose, or constructed or improved with special features, or located in a particular place which bestows unique value on its owner and the owner would not be fairly compensated by the diminution in what the market would pay the owner after the injury or destruction. *Newton Girl Scout Council*, 335 Mass. at 194-195. *Commonwealth* v. *Massachusetts Turnpike Authy.*, 352 Mass. at 147.[6] These "unusual problems of proof of damages 'most frequently arise in cases of service-type properties like churches, convents, hospitals, country clubs, school and college premises and buildings of religious and charitable societies and similar organizations.' " *Correia* v. *New Bedford Redev. Authy.*, 375 Mass. at 363, quoting from *Newton Girl Scout Council*, 335 Mass. at 196. But this list is not a limit on the range of permissible applications of alternative methods of calculating damages. *Correia* v. *New Bedford Redev. Authy.*, *supra* at 363. The same principles have been applied to "special purpose [properties] owned by the State, public agencies, or public utilities, where the evidence warrants the conclusion that the real value of a property . . . cannot be shown . . . by other usual criteria. . . . The principal usefulness of many properties owned by governmental bodies is to their respective owners for a particular purpose . . . ." *Commonwealth* v. *Massachusetts Turnpike Authy.*, 352 Mass. at 147-148.

The judge did not err in admitting evidence other than diminution of fair market value on the issue of damages in this case because diminution in fair market value would not have been a fair and reasonable measure. The authority was committed by statute to using the property to construct a park. See St. 1986, c. 349, § 4. There was evidence presented at trial that the pier was well suited for this purpose. Testimony was elicited describing the pier as "in generally good condition," and needing only modest repairs to adequately support a public park for approximately twenty-five years.

---

*State* v. *Wilson*, 6 Wash. App. 443, 447-448 (1972).

[6]Although many of the cases involving "special purpose property" are eminent domain cases, their teachings have been applied to negligence actions. See *Trinity Church*, 399 Mass. at 49.

Even assuming, therefore, that comparable sales of similar piers were available, or that expert testimony could have established the property's approximate fair market value before and after the fire, the judge had discretion to determine that the resulting figure would not compensate the authority for the special value the property held as a place to build a park, and would not have fairly represented the actual injury suffered by the authority as a result of the fire. Accordingly, it was reasonable for the judge to allow for alternative methods of calculating the damages in this case.

*Use of repair or replacement costs.* The judge allowed the jury to hear evidence regarding both the cost of restoration and replacement.[7] Under the circumstances presented here, this was a reasonable approach. Where diminution in market value is unavailable or unsatisfactory as a measure of damages, courts have routinely turned to replacement or restoration costs as the appropriate measure of damages. *Trinity Church, supra* at 49-50. Where this method is used, "a test of reasonableness is imposed. Not only must the cost of replacement or reconstruction be reasonable, the replacement or reconstruction itself must be reasonably necessary in light of the damage inflicted by a particular defendant." *Id.* at 50.

Replacing or restoring the pier was certainly necessary in light of the fire. There was evidence tending to show that

---

[7]The jury also heard evidence from the authority's consultant that the cost of replacing the damaged sections of the pier's superstructure (leaving the existing pilings) with new timber was approximately $1,158,931. This figure reflected the cost of repairing the existing structure, as near as possible, to its original state. The consultant further testified that replacing the entire structure would cost approximately $1,049,030. This figure, quite obviously, reflected the replacement cost.

The judge subsequently instructed the jury that it could consider alternative formulations to the usual diminution in value method. The judge noted that

> "one alternative formulation, which is appropriate in some situations, is consideration as to whether it is reasonable to assess the cost to restore or to replace to pre-damage condition. Courts have approved, as a measure of damages, the reasonable cost of restoring the property as nearly as reasonably possible to its original condition. [The authority], here, seeks an alternative formulation in the form of reasonable replacement cost of the platform."

roughly sixty-one percent of the wooden members of the platform, other than the pilings, needed to be replaced after the fire. Moreover, the authority was not in a position to sell the property and to find a new location on which to construct a park. Not only was this property part of a larger plan taking into account the surrounding area, but the authority was acting under legislative direction to build a park on this specific location.

Further, this case does not involve some of the typical concerns regarding the use of restoration or replacement costs, such as "where special purpose structures are very greatly out of date, are no longer well fitted to their particular use, and would not be reproduced by any prudent owner." *Commonwealth* v. *Massachusetts Turnpike Authy.*, *supra* at 149. *Benevolent & Protective Order of the Elks*, *supra* at 703-704. Rather, prior to the fire, the pier was reasonably well adapted to the special purposes for which it was intended.

Under the circumstances presented by the unique position of the authority, as well as the distinct qualities of the property itself, the pier possessed a value to its owner that could not be properly weighed by using the ordinary methods of damage calculations. The fire had caused substantial damage to the pier. Therefore, it was reasonable to allow the jury to hear evidence of restoration and replacement costs and to instruct them on the availability of those methods. See *Trinity Church*, *supra* at 49-50.

*Avoidance of overcompensation when evidence of repair or replacement cost is relevant to damages.* Even if the facts justify consideration of evidence other than diminution in fair market value, care must be taken, if possible, not to permit the injured party to recover more than is fair to restore him to his position prior to his loss. He should not recover a windfall. We are well aware of the danger that evidence of repair or replacement costs "may lead to an excessive award unless [they are] . . . *adequately* discounted for obsolescence and inadequacy as well as for physical depreciation" (emphasis in original). *Commonwealth* v. *Massachusetts Turnpike Authy.*, *supra* at 148 (internal quotation marks and citation omitted). Thus, evidence of repair or replacement cost must be adjusted, if possible, to

take into account the condition of the injured property at the time of the injury or loss. For example, if the property has deteriorated by the time of the injury, the plaintiff should not be awarded an amount that would put the property into a condition substantially better than it was at the time of the injury. *Medford Hous. Authy.* v. *Marinucci Bros. & Co.*, 354 Mass. 699, 704 (1968).

Contrary to the claim of Sciaba on appeal, the evidence in this case did reflect appropriate consideration of possible enhancements to the piers and platform even though the sums involved were for the purpose of replacing the structure. There was evidence that, prior to the fire, the pilings were serviceable as were large portions of the remainder of the structure which supported the platform. There was also evidence that the existing pier needed only modest repairs to support the planned park. The necessary improvements were estimated to cost approximately $280,000. Although the jury's award constituted the estimated cost of replacing the platform as calculated by the authority's consultant, this figure ($1,049,130) had been reduced by an amount greater than the anticipated expense of repairing the original (prefire) platform. See note 3, *supra*. Indeed, the cost reduction took into account the expense of replacing the rotted timber portions of the prefire platform, as well as testing and waterproofing the new components. This cost reduction could easily be viewed as representing the general obsolescence of the pier because it roughly reflected the cost of renovating the prefire platform to a state suitable for supporting the planned park. The amount awarded by the jury was clearly based upon evidence that reflected a reduction to account for the general obsolescence of the platform prior to the damage inflicted by Sciaba.

The jury's choice to award replacement costs was a reasonable determination from the evidence presented. The cost to use original portions of the pier and only restore the damaged sections was shown by the authority's consultant to be a more expensive option than replacing the entire pier. Accordingly, this was a case where "to make such a restoration would be an uneconomical and improper way of using the property." *Hopkins* v. *American Pneumatic Serv. Co.*, 194 Mass. 582, 583

(1907). See *Puerto Rico* v. *S.S. Zoe Colocotroni*, 628 F.2d 652, 675 (1st Cir. 1980), cert. denied, 450 U.S. 912 (1981) ("There may be circumstances where direct restoration of the affected area is either physically impossible or so disproportionately expensive that it would not be reasonable to undertake such a remedy"); *Maloof* v. *United States*, 242 F. Supp. 175, 183 (D. Md. 1965) (applicable measure of damages is "the *reasonable* cost of restoring the property as nearly as *reasonably* possible to its [original] condition" [emphasis in original]).

*Instructions to the jury.* The judge's instructions took adequate account of the foregoing legal principles. He was not, as argued by Sciaba on appeal, required to limit the jury's consideration to the difference in fair market value of the structure prior to the fire and after the fire. Furthermore, he adequately informed the jury that in assessing damages under an alternative formulation, it is appropriate to consider "whether it is reasonable to assess the cost to restore or to replace [the pier] to *pre-damage condition*" (emphasis added).

*Other issues.* There was no error in submitting advisory questions to the jury in order to provide them with an opportunity to consider the possibility of assessing damages (1) on a diminution of fair market basis theory, and (2) on a basis of cost of restoration without any regard for adjustment for enhanced value of a reconstructed structure or obsolescence or depreciation. Their answers to these questions do not, for the reasons discussed above, require the entry of a judgment for Sciaba.

*Judgment affirmed.*