## ADDISON F. RUSSELL *vs.* CITY OF NEW BEDFORD.

No. 08-P-441.

Bristol. February 6, 2009. - July 29, 2009.

Present: RAPOZA, C.J., RUBIN, & FECTEAU, JJ.

*Negligence,* Demolition of building. *Municipal Corporations,* Demolition of burnt or dangerous building. *Civil Rights,* Availability of remedy. *Due Process of Law,* Taking of property, Notice. *Damages,* Demolition of building. *Evidence,* Value.

In a civil action arising from the defendant city's demolition of two buildings that the plaintiff owned, the evidence was sufficient to support the conclusion that the city was negligent, given the glaring omissions in the demolition approval process and the fact that the city had actual notice of the plaintiff's interest as true owner prior to demolition and of efforts being taken to satisfy the requirements of the city's building commissioner in order to delay the demolition or remove the property from the list of demolition candidates until the owner had a chance to rehabilitate it [718]; however, although the judge in instructing the jury properly employed the traditional tort measure of damages as to market value, he erred in instructing them that they could consider loss of future profits from rental income for property that had no actual future income, and that they should deduct costs about which there was only conclusory evidence without detail, and therefore, this court vacated the award of damages and remanded the matter for a new trial on that element [722-724].

In a civil action alleging a violation of the plaintiff's civil rights arising from the defendant city's demolition of two buildings that the plaintiff owned, the judge erred in ruling that the city's building commissioner (commissioner) was an official with final decision or policy-making authority for whose unconstitutional acts and decisions the city would be liable, and in denying the city's motion for a directed verdict and a jury instruction on municipal civil liability, where the plaintiff produced no evidence of local positive law, or custom or usage having the force of law, which indicated that the commissioner had final policy-making authority. [719-722]

CIVIL ACTION commenced in the Superior Court Department on December 27, 2001.

The case was tried before *Robert J. Kane,* J.

*Martin Lipman,* Associate City Solicitor, for the defendant.

*Donald J. Fleming* for the plaintiff.

FECTEAU, J. The defendant, the city of New Bedford (city), appeals from a judgment in favor of the plaintiff on his claims, brought under the provisions of G. L. c. 258, § 2, and 42 U.S.C. § 1983 (1994 & Supp. III 1997), that the city unlawfully demolished two buildings he owned.[1] In particular, the city claims that there was insufficient evidence to support verdicts of negligence and civil rights violations. The city next claims that the trial judge abused his discretion by allowing opinion testimony about the future value of the property. The city also claims error in the calculation of prejudgment interest.[2] For the reasons that follow, we affirm the judgment as to liability on the negligence claims, vacate the judgment as to damages on the negligence claims, and order a remand for the reassessment of damages on those claims, and we reverse the judgment as to the civil rights claims.

*Background.* At the time the buildings were demolished in December, 1998, Mark Andrews was the record owner at the registry of deeds and on the city tax rolls. Andrews bought the property at 9-11 Penniman Street in 1996 with financing secured by a mortgage to the plaintiff. In 1997, Andrews delivered a deed in lieu of foreclosure to the plaintiff, but the plaintiff did not record the deed. The city targeted the buildings for demolition[3] and, on April 13, 1998, sent a notice, by certified mail, to Andrews at the address on file at the city assessor's office, stat-

---

[1] In his brief, the plaintiff seeks an additional award of prejudgment interest on the attorney's fees awarded. As he did not appeal, he cannot obtain a more favorable judgment. See *Fortin* v. *Ox-Bow Marina, Inc.*, 408 Mass. 310, 323 (1990).

[2] The city correctly points out, and the plaintiff does not contest, that the interest award incorrectly listed December 1, 2001, as the date interest should commence, rather than December 27, 2001, when the complaint was filed. In light of our remand for the reassessment of damages, the amount of prejudgment interest will need to be recalculated in any event; interest is to be calculated as of this later date.

[3] At the time that the buildings were demolished they were uninhabitable and the plaintiff could not have rented them out. They had been vacant and unsecured for several years. People had entered the buildings through broken windows, and newly installed windows had also been vandalized. There was evidence that the open windows had allowed rain and snow to damage the floors and interior of the buildings. There were no fixtures in the bathrooms, having all been taken out. There was a new toilet in a bathroom, but it had been broken. The buildings had a history of being neglected. Furthermore, no work had been done on the buildings since 1996, when the building permits were canceled.

ing that the buildings were a hazard and could be removed if he did not make the structures safe by noon the day following receipt of the letter.[4] The letter was returned stamped, "attempted, not known." On June 30, 1998, notice was given by the city to the New Bedford Historical Commission (historical commission) that one of the two buildings was slated for demolition.[5] Another notice from the city's survey board was sent to Andrews regarding the potential demolition of both buildings on July 28, 1998.[6] On a list of several buildings proposed for demolition, one of the buildings in question, number nine, appeared; this list was first approved by the historical commission, then approved by the city council and mayor in August and September, 1998, respectively.[7]

In October, 1998, Judith McMullen, a real estate broker and the plaintiff's daughter, gave to the city's building commissioner (commissioner) a letter, signed by Andrews and the plaintiff, authorizing the city to communicate with McMullen about the properties and stating that she was acting on their behalf. McMullen sent a letter to the commissioner describing the plaintiff's intent to rehabilitate the buildings and requesting that they not be demolished. The commissioner informed McMullen that her submission was insufficient and that a report from a structural engineer was required. McMullen obtained such a report and hand-delivered it to the building department on December 8, 1998. The buildings were demolished on December 31, 1998.

The plaintiff filed a two-count complaint against the city alleging negligence and due process violations under 42 U.S.C. § 1983. On special questions, the jury found for the plaintiff on both counts.

---

[4]Although not argued by the parties, the statute is less than clear on whether the notice must actually be received. The notice indicated that the recipient had until noon the day following "receipt" of the notice. The statute, however, states that the recipient has until noon the day following "service" of the notice. G. L. c. 143, § 7.

[5]On this one parcel there were two separately numbered buildings; number eleven, a three-family building close to the street, and number nine, a single-family building set back and partly behind the three-family building.

[6]General Laws c. 143, §§ 8 and 9, require that, before a building may be demolished, a survey board must make a written report and serve it upon the owner, lessee or mortgagee in possession.

[7]For reasons that are not clear, although only one of the two buildings was included on the historical commission's list, the city demolished both buildings.

*Discussion.* a. *Negligence.* There was sufficient evidence that the city negligently demolished the plaintiff's two buildings[8]; the city all but conceded this at oral argument here.[9] Even apart from rather glaring omissions in the demolition approval process,[10] the city's negligence can be inferred from the facts that it had actual notice of the plaintiff's interest as true owner prior to demolition and of efforts being taken to satisfy the commissioner's requirements in order to delay or remove the property from the demolition list until the owner had a chance to rehabilitate it. In addition, the statutory provision giving the city the right to demolish a building after notice and the completion of the survey board's report[11] provides, "[i]f such report declares such structure to be dangerous . . . and if the owner . . . continues such refusal or neglect, the local inspector shall cause it to be made safe or taken down." G. L. c. 143, § 9, as amended through St. 1972, c. 802, § 25. There is ample evidence in the record that the commissioner had actual notice that the owner was not continuing to refuse to repair the property, but was in the repair process when the buildings were demolished. Lastly, it is worth noting that the commissioner conceded in his testimony that the plaintiff's authorized agent, McMullen, submitted the report from a structural engineer that the commissioner had requested. He also conceded that this report was likely sufficient to take the buildings off the demolition list and he could not explain why they were demolished just weeks later.

---

[8]The city has not structured this argument within an appropriate context for review, i.e., for denial of its motion for a directed verdict. The city claims that it properly sent notice to Andrews, the owner of record (notwithstanding that the notice was returned), and not to the plaintiff, who was not listed anywhere as an owner of the property. The city argues that the plaintiff cannot rely on the failure of the notice provision, as he would not have received notice in any event.

[9]Also, when the city argued its motion at the close of the plaintiff's case, the city's attorney concentrated primarily on the civil rights count, moving "generally" on the negligence count. It does not appear in the record that the city filed or argued a motion for judgment notwithstanding the verdict. Given the standard by which a motion for a directed verdict is to be judged, the defendant rightly does not continue to challenge the evidentiary support of the liability verdicts on this count, as they are amply supported by record evidence of a lack of care and adherence to the demands of the statutory scheme for demolition.

[10]See notes 6 and 7, *supra.*

[11]See note 6, *supra.*

b. *Civil rights.* The second count of the plaintiff's complaint against the city was brought pursuant to the provisions of 42 U.S.C. § 1983, for deprivation of his civil rights.[12] The plaintiff does not argue that it was wrong initially to have targeted these buildings for demolition. Rather, he contends that, once the city decided to tear down the buildings, the commissioner failed not only to follow State law in providing adequate notice, but that he failed also to provide and follow due process to allow a building to be removed from that list.[13]

The city argues that the verdict cannot stand[14] because there was insufficient evidence to support the plaintiff's civil rights count, specifically contending that the evidence was insufficient to support the judge's preliminary ruling that the commissioner was an official with final decision or policy-making authority for whose unconstitutional acts and decisions the city would be liable. This ruling, which the city claims as error, served as the linchpin to the judge's denial of the city's motion for directed verdict and the jury instruction on municipal civil rights liability.

In denying the city's motion for directed verdict, and then in his instructions to the jury, the judge relied on *Pembaur* v. *Cincinnati*, 475 U.S. 469 (1986), and *St. Louis* v. *Praprotnik*, 485 U.S. 112 (1988). The judge made a threshold ruling that as matter of

---

[12]The statute provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

[13]According to the plaintiff's opening statement, he based this cause of action on the city's failure to follow proper statutory procedure and proper notice, resulting in the deprivation of his constitutional right to due process and against unlawful seizure of property. In addition, he suggested that after the demolition, the city's attempt to cover up its negligence by alleging a combination of a loss of some key documents and the fabrication of others led to the deprivation of the plaintiff's constitutional rights to due process of law. By the end of the trial, however, the plaintiff's claims of deprivation of rights appear to have merged into a due process claim: that the city's failure to provide adequate notice to the plaintiff and to follow statutory procedures led to the same deprivation, namely, the demolition of the building.

[14]We note the advantage that a well-crafted motion for summary judgment brings with respect to relatively amorphous claims such as this; it would have provided some structure and refinement of the issues for trial. No such motion was filed in this case.

law, the commissioner is the final decision maker, for whose actions the city is responsible. It seems that the judge based his decision solely upon a letter from another city department. The city complains that the evidence upon which the judge made this ruling was inadequate, as matter of law. We agree.

The city relies upon *Monell* v. *Department of Social Servs. of the City of N.Y.*, 436 U.S. 658, 691-692 (1978), for support. In *Monell*, the United States Supreme Court first held that under § 1983, local government units were "persons" and that a municipality could be sued based on wrongs caused through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated" by that municipality. *Id.* at 690. *Monell*, however, "unquestionably involve[d] official policy," *id.* at 694, and "the full contours of municipal liability" remained largely untouched. *Id.* at 695. The *Monell* court did state, however, that a municipality could be held liable when its "lawmakers or . . . those whose edicts or acts may fairly be said to represent official policy" cause constitutional harm. *Id.* at 694.

To be clear, the plaintiff recognizes that municipal liability cannot be based upon a theory of respondeat superior, and he concedes that his case is not based upon an official policy, custom, or practice; rather, he contends that the commissioner was high enough in the city's administration to be considered a final decision or policy maker whose decisions and actions would bind the city under § 1983.[15] The plaintiff relies, as did the trial judge in making his rulings, on this theory of liability, foreshadowed by *Monell* and as interpreted by *Pembaur* and *St. Louis*.

*St. Louis* further defined the contours of municipal liability stating, "an unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business." *St. Louis*, *supra* at 123. See *Pembaur*, *supra* at 480 ("municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances"). One of the appropriate circumstances is where "the decision-

---

[15]There is no issue concerning whether the commissioner was acting under color of law. Additionally, the plaintiff concedes that his only viable theory of civil rights liability against the city under the circumstances of this case is that enunciated under the "single-decision/act" exception to *Monell's* policy or planning rule.

maker possesses final authority to establish municipal policy with respect to the action ordered," *id.* at 481, which "may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law." *Id.* at 483. However, as the Supreme Court identified the sources where a judge should look to determine the sufficiency of this theory of liability, it becomes clear that the plaintiff failed to produce adequate evidence for the judge to make this ruling.

First, according to *St. Louis*, State law could "include valid local ordinances and regulations" that "will always direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business." *St. Louis*, 485 U.S. at 125. Critically, for the instant plaintiff, the Court said that "a federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." *Id.* at 126.

This determination process was further defined in *Jett* v. *Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989). There, the Court stated that "the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge *before* the case is submitted to the jury. Reviewing the relevant legal materials, including state and local positive law, as well as ' "custom or usage" having the force of law,' [*St. Louis*], *supra*, at 124, n. 1, the trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *Jett, supra* at 737.

Here, the plaintiff, having the burden of production, provided no evidence of local positive law, or custom or usage having the force of law, which indicated that the commissioner had final policy-making authority. In making his ruling, the judge was constricted in his fact finding, appearing to rely on only one letter from a lateral municipal department. However, neither the letter alone nor the letter considered together with the plaintiff's other evidence, including the commissioner's testimony, carried the required force.

The plaintiff did not offer in evidence local city ordinances pertaining to the commissioner's position of authority within the city's hierarchy. "Neither a trial judge nor this court can consider such alleged ordinances [or by-laws] unless they are put in evidence." *Fournier* v. *Central Taxi Cab, Inc.*, 331 Mass. 248, 249 (1954), and cases cited. See *Trustees of the Stigmatine Fathers, Inc.* v. *Secretary of Admn. & Fin.*, 369 Mass. 562, 568 (1976). Nor are local ordinances and by-laws "an appropriate subject of judicial notice." *Lawrence* v. *Falzarano*, 380 Mass. 18, 25 n.10 (1980). See Mass. G. Evid. § 202(c) (2008-2009).

Therefore, without evidence of the pertinent ordinances, or other evidence of custom or usage having the force of law, the evidentiary record before the trial judge was not adequate to make a ruling. See *Warren* v. *Zoning Bd. of Appeals of Amherst*, 383 Mass. 1, 8 (1981). Consequently, the judge's ruling that the commissioner was an official policy maker whose single decision was sufficient to bind the municipality was erroneous. This error then fatally infected the judge's denial of the city's motion for directed verdict on the civil rights counts which, for the foregoing reasons, should have been allowed; the judgment in favor of the plaintiff on his civil rights counts must, therefore, be reversed.

*c. Expert testimony and damages.* While the city challenges the testimony of McMullen, the plaintiff's real estate agent and daughter, as an expert and as to valuation method, the question critical to this issue is whether the proper measure of damages was used.[16] Given our conclusion on the measure of damages, we need not decide whether the judge properly decided the threshold question of McMullen's qualification as an expert.

"Generally, the appropriate measure of damages in actions for negligent injury to property is the difference between the

---

[16]The judge instructed the jury to consider two things with respect to damages: (1) the fair market value as of the date of trial and (2) the likelihood that the plaintiff would rehabilitate the properties, then convert them to rental units, and how much they would make from rental income. To calculate the fair market value, the judge instructed the jury to consider the market value of the property at the time of the trial, including what the value would be as rental income property if the plaintiff had rehabilitated and rented the buildings. He also said that his instructions on damages for negligence were the same as the damages for the civil rights actions on the properties. Curiously, the jury awarded a combined total of $70,000 for the two properties on the negligence count and $20,000 for both on the civil rights actions.

fair market value of the property prior to the loss and its fair market value after the loss caused by the tortfeasor." *Massachusetts Port Authy.* v. *Sciaba Constr. Corp.*, 54 Mass. App. Ct. 509, 513-514 (2002), citing *Trinity Church in the City of Boston* v. *John Hancock Mut. Life Ins. Co.*, 399 Mass. 43, 48 (1987), *S.C.*, 405 Mass. 682 (1989). See *Hopkins* v. *American Pneumatic Serv. Co.*, 194 Mass. 582, 583 (1907). "[M]arket value does not in all cases afford a correct measure of indemnity, and is not therefore 'a universal test.' " *Trinity Church, supra* at 48, quoting from *Wall* v. *Platt*, 169 Mass. 398, 405-406 (1897). Other evidence may be admissible but "the evidence must support the inference that diminution in fair market value is not a fair and adequate measure of damages." *Sciaba, supra* at 514. The general rule may not apply to a certain category of properties, termed "service-type property," *id.* at 515, or " 'special purpose property' (such as the property of nonprofit, charitable, or religious organizations), [where] there will not generally be an active market from which the diminution in market value may be determined." *Trinity Church, supra* at 49.

The plaintiff here argues that the general rule should not apply to his property, yet he neither argues nor shows why his demolished properties were special-purpose properties or service-type properties such that the exception should apply.[17] Indeed, they were not, as the record amply supports the fact that they were uninhabitable residential properties.[18] Consequently, this trial record does not support a deviation from the traditional tort measure of damages as to market value.

[17]The plaintiff's appellate argument on this issue consists of one paragraph. He does not advance any arguments showing why the loss of an uninhabitable (and uninhabited) building justifies damages for future rental income and relies exclusively on two cases. The first, *Trinity Church, supra* at 48-49, is distinguishable because it involves damage to a church, a special purpose property. The second, *Portland Natural Gas Transmission Sys.* v. *19.2 Acres of Land*, 318 F.3d 279, 282 (1st Cir. 2003), is a "partial taking" case in which the "incidental damage" issue pertains to the availability of damages to the portion of land not taken. Thus, *Portland* seems inapposite to the damages claim herein, especially for loss in rental income.

[18]We do not intend by this discussion to foreclose the possible use of damage measures other than diminution of fair market value, when supported in law and fact. See, e.g., *Sciaba*, 54 Mass. App. Ct. at 513-517. Evidence of, and instructions about, value after restoration and future rental income was clearly inappropriate in this case as overly speculative.

Moreover, McMullen's testimony and the judge's instructions on the loss of future profits from the rental income that might be generated, to which the city objected, were improper, as both depended upon a likelihood that the buildings would have been rehabilitated and rented, prospects that were speculative. Lost rental income has been permitted as damages but only in cases in which the property had actual future income, as opposed to only a possibility of future income. See *Guaranty-First Trust Co.* v. *Textron, Inc.*, 416 Mass. 332, 336-337 (1993). Moreover, the judge instructed the jury that they must deduct from those values the costs of rehabilitation and vacancy, as well as the usual expenses of owning property, about which there was conclusory evidence without detail. Consequently, the judgment in favor of the plaintiff on negligence must be vacated with respect to damages and the case remanded for a new trial on that element.

*Conclusion.* We reverse those portions of the judgment that pertain to liability and damages on the civil rights claims. Although we affirm those portions of the judgment that pertain to liability on the negligence claims, we vacate the portions of the judgment that pertain to damages on those claims. We remand the case to the trial court for a new trial, limited to the issue of damages on the negligence claims.

*So ordered.*